**UNICORP FINANCIAL CORPORATION,**
**Plaintiff,**

v.

**FIRST UNION REAL ESTATE EQUITY AND MORTGAGE INVESTMENTS, et al., Defendants.**

No. C–2–81–444.

United States District Court,
S. D. Ohio, E. D.

April 13, 1981.

**250**

David S. Cupps, Columbus, Ohio, for plaintiff.

James M. Tobin, Thomas E. Palmer, Columbus, Ohio, for defendants.

## MEMORANDUM AND ORDER

DUNCAN, District Judge.

This matter is before the Court on the motion of plaintiff, Unicorp Financial Corporation (Unicorp), for a preliminary injunction in relation to a proxy solicitation undertaken by the defendant, First Union Real Estate Equity and Mortgage Investments (First Union), to be voted at the annual meeting of First Union shareholders scheduled for April 14, 1981. The original proxy solicitation was mailed on March 4, 1981, by First Union. Contending that the solicitation violated federal securities laws and state law, Unicorp commenced this action on March 18. There has since been considerable activity by both sides, including the issuance of an opposing proxy solicitation by Unicorp and additional communications to the shareholders by both sides to the dispute. After expedited discovery, the Court heard two days of testimony on the plaintiff's motion preliminary to enjoin the

defendants from further solicitation of proxies, from voting proxies they have thus far collected, and from proceeding with the annual meeting as scheduled. After consideration of the pleadings, the evidence presented to the Court on April 7 and 8, 1981, the briefs of the parties, and the oral argument of counsel, the Court has determined to deny plaintiff's application. The Court's findings of fact and conclusions of law in this regard are set forth below, as required by Fed.R.Civ.P. 52.

## I. *Findings of Fact*

1. Plaintiff Unicorp is an investment holding company organized under the laws of the province of Ontario, Canada.

2. George S. Mann, a Canadian citizen, is President, Chief Executive Officer, a Director, and the controlling shareholder of Unicorp. Mann owns approximately 56% of the outstanding Class A Common Shares and 65% of the outstanding Class B Common Shares of Unicorp.

3. First Union is an unincorporated trust existing pursuant to a Declaration of Trust governed by Ohio law and originally settled August 1, 1961, as amended, with its principal place of business in Cleveland, Ohio. Securities of the trust, including its Shares of Beneficial Interest, are publicly held and registered pursuant to Section 12 of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*

4. Defendants James A. Hughes, George J. Grabner, James D. Ireland, William A. Parker, Jr., James F. Preston, Jr., Donald S. Schofield, Ellery Sedgwick, Jr., and Richard B. Tullis each are citizens of the United States and trustees of the trust.

5. Defendant Donald S. Schofield is also President and Chief Executive Officer of First Union.

### *The First Union Trust*

6. First Union was created in 1961 for the purpose of conducting business as a real estate investment trust (REIT) as that term is defined in Section 856 of the Internal Revenue Code of 1954, as amended. Congress authorized the creation of REITs primarily to permit small investors to enjoy the benefits arising from the ownership of commercial properties and the substantial tax benefit that certain income earned by a REIT and distributed to its shareholders is not taxed at the business entity level. [H.Rep.No.2020, 86th Cong., 2d Sess. June 28, 1960.]

7. Section 2.1 of the Amended Declaration of Trust provides, "Any determination of the purposes of the Trust made by the Trustees in good faith shall be conclusive." Section 2.8 authorizes the trustees, with the approval of a majority of holders of outstanding shares, to transfer trust property to a corporation and other entity, subject to the following condition:

> Provided, however, that no transfer of substantially all of the Trust property shall be made to any corporation, trust, association, or other organization if the Federal Income Tax benefits equivalent to those available under sections 856 to 858 of the Internal Revenue Code to Real Estate Investment Trusts which receive and distribute the income from such property would not be available to such transferee.

Section 5.9 provides:

> The Trustees may from time to time adopt such regulations as they see fit relating to issue, transfer, recording and registry of shares and the effects thereof, the issuance or prohibition of fractional shares, the use of scrip in place of fractional shares and the Trustees, by provision in the By-Laws may restrict or regulate issuance of transfer of shares in such manner as they, with advice of counsel, shall deem advisable to prevent disqualification of the Trust for taxation as a real estate investment trust under the Internal Revenue Code and the regulations (proposed or in effect) thereunder.

8. In order to attain and maintain REIT status, a business trust entity must: (a) derive at least 75% of its gross income from real estate investments; (b) distribute at least 95% of its ordinary taxable income to its shareholders; (c) have more than 100 beneficiaries; and (d) not be a "personal

holding company" within the meaning of the Internal Revenue Code—*i.e.*, not have more than 50% of the value of outstanding shares owned directly or indirectly by five or fewer individuals.

9. First Union is engaged principally in the business of investing in large office buildings, regional shopping malls and associated parking facilities. It owns such properties throughout the United States and actively competes for prime real estate investments with other equity REITs.

10. The Declaration of Trust now provides for three to fifteen trustees. At present, there are nine trustees, seven of whom are "outside" trustees and two of whom are employed by the trust. In 1979, the trustees adopted a policy pursuant to which the oldest member of the Board retires each year. The Declaration of Trust vests broad powers in the trustees. A primary responsibility of the trustees is to assure continuation of the REIT status of the trust for the benefit of its approximately 10,000 shareholders.

11. Each of the defendant trustees owns substantially less than 1% of the outstanding shares of the trust.

### The Activities of Unicorp and Mann

12. Beginning in late 1978, Unicorp commenced a major program of diversifying its real estate investments into the United States through purchases of interests in publicly-traded, equity-oriented real estate investment trusts.

13. Unicorp began accumulating shares of four United States REITs—Greit Realty Trust (GREIT), Real Estate Investment Trust of America (REITA), San Francisco Real Estate Investors (SFI) and First Union. Unicorp's philosophy was and is that the market value of the real estate owned by the REITs in which it invests is greater than the value at which the shares of the REITs trade on the stock exchange.

14. Unicorp continued to purchase shares of First Union on the New York Stock Exchange during 1979 and 1980. By virtue of Section 13(d)(1) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(d)(1), any person who obtains directly or indirectly a beneficial ownership of more than 5% of First Union's shares must file with the Securities and Exchange Commission (SEC) and send to First Union a Schedule 13D and thereafter amend that 13D each time there is at least a 1% or more change in his holdings. In August 1979, Unicorp and Mann filed a 13D with the SEC and served a copy upon First Union revealing that Unicorp had acquired more than 5% of the shares of First Union and stating that acquisition was for investment purposes only. Prior to this time, no single shareholder had ever owned such a large percentage of beneficial ownership in the trust. Since that time, Unicorp and Mann have filed 14 amendments to their 13D, which reveal a steady pattern of increased holdings of First Union shares. Amendment No. 12, mailed to First Union on March 16, 1981, three days after this suit was filed, states that on the day before suit was filed Unicorp owned 25.9% of First Union's shares on a SEC reporting basis. At the time of the hearing, Unicorp's investment in First Union exceeded $37,000,-000.00.

15. The first thirteen 13D schedules Unicorp filed with the SEC stated that acquisition of First Union shares was for investment purposes only. The latest amendment does not indicate that Unicorp is acquiring shares for investment purposes only.

16. From late 1978 through 1980, Unicorp was also acquiring major share positions in GREIT, SFI and REITA. By December 31, 1980, Unicorp owned 49.4% of the stock of GREIT, 24.7% of the stock of SFI (an additional 15% of which is owned by GREIT) and 10.6% of the stock of REITA; it had two representatives on the Board of Trustees of GREIT and SFI; and it controlled both GREIT and SFI. The trustees heard in January 1980 that Unicorp was in the process of "de-reiting" GREIT.

17. Unicorp filed 13D schedules regarding its acquisitions in GREIT. The statement of purpose in those schedules stated acquisition was for investment purposes

only until Unicorp acquired 30% of ownership, at which time its statement of purpose changed to include the intention to obtain sufficient shares to significantly influence proposals of management.

18. At its regularly-scheduled meeting in September 1979, the Board of Trustees discussed Unicorp's Schedule 13D relating to acquisition in First Union. The Board or management has continued to review each 13D schedule filed by Unicorp since that time.

19. Neither Mann nor Unicorp has ever stated that they intend to "de-reit" REITA, SFI, or First Union. Mann testified that he had no such intentions.

20. In January 1980, and from time to time thereafter, Mann requested a seat on First Union's Board of Trustees. After initially considering the suggestions, the trustees ultimately declined to accede to Mann's request.

21. The plaintiff has made considerable issue of certain actions taken by the trust which it contends were a series of defensive maneuvers aimed at Unicorp. The Court finds the following actions to have been taken for substantial reasons other than that alleged by Unicorp:

(a) June 1980—The trust's 1980 Annual Report reflects the sale of a small office building in Los Angeles and the planned distribution of the capital gains received from the sale to shareholders. It also, for the first time, reflects a valuation of the trust in terms of the fair value of its assets. Based on the testimony of Schofield the Court believes neither of these events were intended to be defensive maneuvers.

(b) Steadily since 1979 the trust has increased the dividends paid to shareholders. The testimony tends to show that these increases are part of a preexisting policy of the trust to pay increasing dividends and not a measure prompted by Unicorp's actions.

(c) In August 1980, the Board agreed to accelerate the vesting of shares earned by Schofield pursuant to an extra compensation agreement signed in 1978.

This decision was apparently prompted by Mann's accumulations and assured that the shares already earned pursuant to the 1978 agreement would not be forfeited in the event Schofield were to lose his position at the trust. The amount involved was, relative to existing outstanding shares, not significant and the effect could make the employee less resistant to outside influence. Accordingly the Court has great difficulty characterizing this as a defensive maneuver.

(d) In September 1980, Schofield traveled to Holland to confer with its Dutch investors regarding their investments in First Union. This trip was incidental to, and not motivated by, Unicorp's activities.

(e) In December 1980, the trust issued $40,000,000 of 10% convertible debentures. MacDonald & Co. and Merrill Lynch, Pierce, Fenner & Smith served as co-managing underwriters for the trust's 10% debentures. In connection with underwriting the 10% debentures, Merrill Lynch and its attorneys conducted a due diligence review of the trust during November and December of 1980. The due diligence review included, among other things, interviews of the trust's officers, trustees and counsel. No officer, trustee or attorney of First Union advised Merrill Lynch during the course of the due diligence review that the tax status of the trust as a REIT was in jeopardy—or even subject to question—and the representatives of and counsel for Merrill Lynch did not discover anything which led them to question the tax status of the trust. If there had been any question about the trust's tax status, Merrill Lynch would have required prospectus disclosure of that question because of its materiality. The prospectus issued by First Union and approved by the trustees in connection with the offer and sale of the 10% debentures made no mention of any threat to or question about the tax status of the trust as a REIT. The disclosure in that prospectus was proper because there was at that time no threat to the trust's tax

status and none was perceived by the trustees. The issuance of the debenture was made primarily in order to raise revenue for First Union and dilution of Unicorp's ownership was not a substantial factor.

22. The management and trustees of First Union became increasingly wary of the real intentions of Unicorp and Mann with respect to the trust despite the repeated statement in the 13D as amended that Unicorp was acquiring First Union shares for investment purposes only. The following actions taken can be reasonably construed to have been taken for defensive purposes.

(a) On August 8, 1980, a special meeting of the Board of Trustees was convened. At that meeting, the trustees passed a resolution limiting the investment of any shareholder of the Trust to 9.8% or less of the shares. The reason stated in the trust's minutes for that restriction upon ownership of the shares was to allow the trust's Board and management to explore a plan to "staple" the stock of the trust and the stock of its management company, First Union Management, Inc.—a plan which could not be effected if any shareholder owned more than 10% of the shares. There was arguably no substantial business or tax reason for the trust to develop a stapled-stock plan because, as a result of an earlier IRS ruling, the trust had enjoyed the business and tax benefits which were only then being sought by other REITs pursuing IRS approval of their stapled stock proposals. First Union dropped the plan after conferring with Mann who told them he had purchased debentures in reliance on a prospectus which had not disclosed any concerns that the trust might lose the benefit of its favorable tax ruling and that Unicorp had already purchased more than 10% of the trust's shares.

(b) At a board meeting held December 12, 1980, the Board considered amending the Declaration of Trust to fix at nine (9) the number of trusteeships available, to stagger election of the Board so that only three members would be elected each year, to eliminate cumulative voting, and to impose stated eligibility requirements for trustees to prevent potential conflicts of interest with the business of the trust. At meetings on January 15 and 27, 1981, the Board ultimately rejected staggering the election of trustees, but approved proposals to eliminate cumulative voting and to place a no-conflict of interest policy in the Declaration of Trust. The Court finds that these actions were substantially defensive in nature.

### The Proxy Contest

23. On March 4, 1981, First Union issued the proxy solicitation which is the subject of the instant proceeding. The contested proposal is summarized in the notice to shareholders as follows:

1. To approve amending Sections 8.2, 8.3, and 8.10 of the Declaration of Trust to eliminate cumulative voting, to prohibit Trustees from pursuing interests that conflict with those of the Trust, and to provide that any person who does not meet the qualifications for Trustees be ineligible for election as Trustee or be subject to removal from office.

The March 4 mailing consists of a 22-page pamphlet containing a letter to shareholders, the notice, a statement describing the proxies, and Exhibit A, which contains the specific language of each proposed amendment. The March 4 mailing and all subsequent mailings introduced into evidence are appended to this memorandum and order.

24. The trustees state as their purpose in approving these proposals that in their judgment the accumulation of a large percentage of the trust's shares by Unicorp or anyone else was a potential threat to REIT status, and that to adopt these measures would tend to discourage such accumulations.

25. On March 18, Unicorp mailed its own proxy solicitation to the shareholders, advancing its belief that the trustees' proposals could reduce the potential attractiveness of shareholders' investments, insulate present management from the need to be

responsive to its shareholders, take management off the performance standard shareholders are entitled to expect of it and impede corporate democracy. Unicorp urged the shareholders to cast their proxy against the trustees' proposals and argued in a nine-page document its reasons for so urging.

26. On March 25, Mann and Unicorp mailed an additional three-page letter to shareholders urging them to vote against the proposals and explaining why.

27. On March 26, 1981, First Union mailed a "stop, look and listen" letter to its shareholders informing them that it intended to submit further information about Mann and Unicorp. On April 2, 1981, First Union submitted a four-page letter of supplementary information warning of its perceived fears concerning Mann and Unicorp and reiterating its plea for a vote for its proxy.

28. Unicorp countered on April 6 with a four-page letter introducing James B. McGarvie, whom it announced it will nominate as a trustee, and urging the shareholders again to vote down First Union's proposal.

29. The Annual Meeting of Shareholders is scheduled for Tuesday, April 14, 1981.

### II. Conclusions of Law

#### Standards for Issuance of Preliminary Injunctive Relief

It must be noted at the outset that at this stage of the action the case is not before the Court on the merits but rather on the question whether plaintiff has satisfactorily demonstrated that preliminary injunctive relief is warranted. Therefore the inquiry at this stage is limited to whether the plaintiff has shown (1) a strong or substantial likelihood or probability of success on the merits; (2) irreparable injury; (3) that the issuance of a preliminary injunction would not cause substantial harm to others; and (4) that the public interest would be served by issuing a preliminary injunction. *Mason County Medical Ass'n. v. Knebel,* 563 F.2d 256, 261 (6th Cir. 1977).

#### (1) *Likelihood of Success on the Merits*

Plaintiff's motion for preliminary injunction is directed to the first cause of action of its complaint, which alleges that the proxy materials issued by First Union violate Section 14(a) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78n(a) and Rule 14a–9 promulgated pursuant thereto. Section 14(a) declares it "unlawful" to solicit proxies in contravention of Commission rules, and SEC Rule 14a–9 prohibits solicitations "containing any statement which . . . is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading . . . ." Use of a solicitation that is materially misleading is itself a violation of law. *Mills v. Electric Auto-Lite,* 396 U.S. 375, 383, 90 S.Ct. 616, 621, 24 L.Ed.2d 593 (1970).

In its complaint, Unicorp sets forth in nine paragraphs its allegations concerning the legal sufficiency of First Union's proxy solicitations. For the purpose of analysis the Court has regrouped them into three categories as follows:

(a) Unicorp's contentions directed at all of the proposals taken together.

(b) Unicorp's contentions directed at specific proposals.

(c) Unicorp's contentions directed at the combined presentation of several proposed amendments in one "Unitary Proposal."

The Court's preliminary findings and conclusions with regard to each of these claims are set forth below.

#### (a) *Unicorp's contentions directed at all of the proposals taken together*

In paragraphs (3), (f), (g) and (i) of the First Cause of Action of its complaint, plaintiff makes certain allegations concerning the First Union proxy solicitation as a whole. It alleges that the proxy statement is false, misleading and omissive because it creates and was intended to create the false impressions that the proposals are intended to preserve the trust's status as a REIT, to prevent the danger of losing its REIT tax

status and to respond to a general concern regarding accumulations. The plaintiff contends that the statements are false because in point of fact the proposals are aimed directly and specifically at Unicorp, they are misleading and omissive because the fears are unjustified given certain existing provisions of the Declaration of Trust, and they omit disclosure of the number of shareholders and the present distribution of shares among them which is necessary to determine the magnitude of the potential threat.

First, the plaintiff asserts generally that the proxy statement creates the mistaken false impression that the proposed amendments are intended to preserve the trust's status as a REIT, and thereby omits any explanation of the real reason for the amendments, that of attempting to "freeze out" Unicorp. The freeze-out process, apparently, includes the Board of Trustees' studied resistance to the presence of Mann or his representative on the Board of Trustees. Unicorp contends that it is false, misleading and omissive to advance the amendments as a tool to preserve the REIT status of the trust rather than as a tool which has as its primary purpose the thwarting of Unicorp's rights as a shareholder. The difficulty with that argument as an abstract proposition is that Unicorp has failed to convince this Court, at this stage of the proceedings, at least, that there is any real difference between the two aims. The trustees have set forth a plausible explanation of their position in the theory that the accumulation of beneficial ownership by Unicorp and the prospect of continuing accumulation by that company, with the attendant potential for influence over the affairs of the trust, pose a potential threat to the maintenance of First Union as a qualified REIT. First Union may be wrong in its assumption, but in view of the evidence available to it when it first issued the proxy materials and in view of the evidence since adduced at hearing, the Court cannot say that the trustees' theory is not plausible or not held in a genuine good faith belief. It is arguable that other persons similarly situated to these trustees may not have reached as intensely as did these trustees to Unicorp's accumulations. But the Court, having heard the testimony of three of the trustees, cannot say that their actions and motives were in bad faith. In the light of information coming to First Union from a number of sources concerning Mann's activities, it is not unreasonable to consider a "freeze-out" of Unicorp and the maintenance of the trust's REIT tax status as two sides of the same coin.

The Amended Declaration of Trust clearly imposes an obligation on the part of the trustees to maintain the favorable tax status afforded a REIT. *See, e.g.,* Section 2.8, 5.9 and 9.1 of that document. The evidence indicates that the trustees take that obligation quite seriously and consider it their primary duty to preserve the tax advantages on behalf of all of the beneficiaries. It would appear that reasonable actions taken that are designed to protect the trust's status as a REIT are for a proper business purpose, notwithstanding that such activity may have been triggered by an immediate threat posed by a particular accumulator. This case is thus distinguishable from *Royal Industries, Inc. v. Monogram Industries, Inc.,* [CCH] Fed.Sec.L. Rpts. ¶ 95,863 (C.D.Ca.1976) wherein the court enjoined a defensive acquisition undertaken for the "sole, primary, compelling and controlling purpose" of thwarting a tender offer. *Id.* at 91,138.

In its March 4, 1981, letter to shareholders, the trust stated, "In your Board's opinion, these amendments will tend to assure the continuation of First Union as a qualified real estate investment trust under the Internal Revenue Code thereby preserving the important tax benefits currently available to the Trust and its shareholders."

On page two of the March 4 proxy statement, it is stated:

The amendments will, in the opinion of the Board of Trustees, assist the Board in preserving the status of First Union as a vehicle for investment in major real estate holdings with the federal tax treatment accorded a [REIT] . . . .

On page three, the statement refers to other instances of accumulations observed by the Board, introduces George Mann and Unicorp and describes their holdings as of December 1, 1980. It states: "Neither management nor the Board of Trustees is aware that any attempted unfriendly takeover of First Union is in progress or proposed," and reveals that

The proposed amendments are a result of the Trustees' concern with recent accumulations of REIT shares discussed above, including investment activities of Unicorp and Mr. Mann, and a result of the Trustees' belief that cumulative voting is not in the best interests of the Trust generally.

The Court believes that it is unlikely that Unicorp could establish at trial that these statements are false or misleading. The proxy statement as a whole adequately conveys the substance of the evidence presented to the Court of the good faith beliefs of the trustees as to the reasons for their proxy solicitation.

In addition, it appears probable that any doubt a shareholder might have had about Unicorp's position as the immediate object of the Board's proposals has since been decidedly dispelled by subsequent communications by both sides to the dispute.

■ The Court is obligated to consider the plaintiff's contentions in light of the "total mix" of information made available to the shareholders prior to the meeting, *see* *TSC Industries, Inc. v. Northway*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). In the context of a case such as this one, wherein the shareholders have been bombarded with communications from both sides to a hotly-contested dispute, the total mix includes mailings subsequent to the original proxy solicitation that tend to "cure" any earlier defects. *Spielman v. General Host Corp.*, 402 F.Supp. 190, 194–95 (S.D.N.Y.1975), *aff'd per curiam*, 538 F.2d 39 (2d Cir. 1976). The issues will have been fully aired by virtue of the extensive communications to the shareholders of both parties. *Kennecott Copper Corp. v. Curtiss-Wright Corp.*, 584 F.2d 1195, 1200 (2d Cir. 1978).

Plaintiff contended at final argument that the curative effect of subsequent mailings could not be credited because with the passage of time and the casting of votes, new materials were directed at a decreasing percentage of voting shareholders. The argument is not persuasive since what impact, if any, on the results of the election caused by some shareholders casting their vote prior to reception of all the proxy materials from both parties is not known at this time. The inference that there may be some effect is available, but on the other hand, any shareholder who has already submitted his proxy can revoke it and Unicorp's mailings explain clearly how that is to be done. Therefore on balance this seems to be a matter that is best left to further proceedings in this case. Certainly the Unicorp mailings bring home to any perplexed shareholder that the trust has squared off with Unicorp and George Mann, and the April 2 supplementary materials make this point unmistakable:

In our letter to you dated March 26, we promised to give you additional information concerning George S. Mann and Unicorp Financial Corporation. They have asked you to vote against the Trustees' proposals to eliminate cumulative voting and prevent someone with a conflict of interest from being a Trustee of First Union. Although the proposals are intended to address problems caused by any large accumulation of First Union Shares, the major concern of the Trustees at this time is clearly Unicorp and Mann, the only holders of a significant bloc of shares known to the Trustees. We believe their reasons for opposing these issues are not in the best interests of the Trust and its shareholders. Let us tell you why.

• Unicorp, a Canadian corporation controlled by Mann, a Canadian citizen, is an investor in several U. S. REITs that compete directly with First Union for real estate opportunities, and as such has a substantial conflict of interest.

• It has been and is the stated policy of Unicorp and Mann to acquire interests in U. S. REITs at prices below the fair market value of the real estate owned by these REITs.

• These activities of Unicorp and Mann could cause the Trust to lose its status as a REIT and the favorable tax treatment such status provides for *all* First Union shareholders.

Unicorp's expert witness on securities law, Professor Barbara Ash, testified that in her opinion absent a serious risk that the trust would lose its special tax status the proxy materials would be materially misleading because they suggest that First Union's tax status is in jeopardy. The Court has preliminarily reached a different conclusion, first, because it believes that the plaintiff has not shown a strong probability of convincing a trier of fact that it was on March 4, 1981, unreasonable to perceive a risk existed. In the context of a dynamic situation, the trustees can be expected to view the mounting accumulation of shares in one shareholder and use foresight to determine what the result might be; certainly they should not be bound by the statements of the accumulator. Given the difficulty in a publicly-traded entity of knowing at any point in time precisely who owns how much, trustees need not sit on their hands until the critical point is reached but are entitled to use their good faith business judgment about the seriousness of the "risk."

Second, the Court's reading of the proxy materials reveals that the drafters of it took care to state their position in qualified terms. The Board's apprehension of the likelihood of losing REIT status does not appear to be overstated.

Professor Ash was also asked her opinion of the lawfulness of the proxy materials if it were a fact that a substantial purpose of the trustees in proposing the amendments was to limit or prevent Unicorp from exercising its voting control to influence decisions of management. In that event, she testified, the materials would be omissive. The Court disagrees. As stated above, the proxy materials must be read and interpreted as a whole, and that a proper understanding of their import cannot be had by reading selected sentences. The Board states plainly its purposes in proposing the amendments. Thus, in the first paragraph of page two of the proxy statement under the heading "Purposes of the Proposed Changes" First Union states:

As described below, the amendments will better enable the Board to continue to protect the interests of small shareholders who desire to retain such an investment in real properties by making it more difficult for First Union to be subjected to an unfriendly takeover, or for a large shareholder to gain control of First Union or to influence management.

The attachment goes on to discuss the nature of its REIT status and its perceived duty to protect that status. It continues:

Consistent with this legislative purpose, the Code provides, for example, that First Union would lose its tax status as a REIT if it had less than 100 shareholders for most of its taxable year or if it were a "personal holding company" as defined by the Code (*e. g.*, if more than 50% of the value of the Trust's outstanding Shares were to be owned, directly or indirectly, by five or fewer individuals during the last half of the Trust's taxable year).

Shareholder requirements such as these could result in inadvertent loss of REIT qualification. Consequently, accumulations of large holdings of First Union Shares are, in the judgment of the Board, potential threats to First Union's status as a REIT and to the favorable tax treatment such status provides for the other shareholders. The Board of Trustees anticipates that the amendments may tend to discourage such accumulations. Such a result would be consistent with the goal of maintaining the Trust as a real estate investment vehicle for small investors as contemplated by Congress.

The Board of Trustees has observed recent instances in which investors have accumulated large blocs of shares in corporations and other entities including REITs. Such accumulations (effected

through tender offers or market purchases) are often followed in time by business combinations to eliminate public share ownership in the "target" entity. Even if such a final step is not taken, the large shareholder frequently uses a variety of pressures to take control of the "target" entity, including election of the large shareholder's own representatives on the Board.

The materials then state that they are aware of no pending "takeovers" but describe George Mann and the activities of Unicorp and the recommendation that the amendments may protect the trust if the intention of Mann and Unicorp should change in the future. The materials are plainly not omissive in this respect.

Plaintiff strongly urges that the Board's proposed freeze-out amendments are misleading and omit facts essential to a reasonable shareholder's exercise of voting rights. Plaintiff's Ex. 30. As the Court understands this contention, plaintiff claims that the proxy information tends to mask the Board's real intent—to prevent Mann or his representative from Board membership as a part of the freeze-out strategy—by failing to apprise the shareholders of the *specific* role of these proposed amendments in accomplishing the freeze-out of Unicorp. With such specific information omitted, a shareholder could mistakenly believe that such amendments are not primarily aimed at Unicorp but are amendments which are otherwise necessary to the continued vitality of the REIT's IRS status. Plaintiff urges that specific information as to how these amendments will impact Unicorp is essential since without an understanding of that relationship shareholders will not have a basis to intelligently vote the combined proposal up or down.

Clearly there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available. *TSC Industries, Inc. v. Northway*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976) (footnote omitted).

The Court is therefore presented with two questions. First, would such explanation as to exactly how the freeze-out amendments are to work to interdict Unicorp significantly alter the total mix? Second, in the absence of such specifics, can reasonable shareholders, from a reading of all the materials available, understand the relationship between the freeze-out amendments and the Board's clearly stated purpose to repel the Unicorp threat?

The Court believes that the answer to the second inquiry satisfactorily resolves the first. A reasonable shareholder reading the materials will sufficiently understand that if the amendments are enacted, neither Mann nor his representative can have a reasonable expectation of being elected to the Board, or if elected remain on that Board if a majority decides otherwise. Certainly, a reasonable shareholder would understand this is a part of the Board's effort to stop Unicorp.

Accordingly, the Court finds that the materials, taken as a whole, do not mislead the investors into believing the proxy solicitation is something that it is not.

Plaintiff next contends that any fears the defendants may have about losing its REIT status are unjustified because the Declaration of Trust provides the Trustees with existing powers which are sufficient to prevent the loss of its REIT status. The only such power discussed at the hearing was that which permits the Board to restrict a transfer of shares that would actually destroy the REIT tax status of the trust. The effectiveness of this mechanism is disputed, and it appears highly questionable that the plaintiff will prevail at trial on the question. In any event, in both the March 4 and the April 2, 1981, materials, First Union does describe its existing powers in this regard. *See, e. g.*, p. 4–5 of the proxy statement. The Court is satisfied that this disclosure is adequate.

Finally, plaintiff contends the proxy statement is false, misleading and omissive in failing to disclose that the proposed

amendments could diminish the market value of the trust's shares. The Court disagrees. Plaintiff has not persuaded the Court that any probability exists that the proposed amendments would diminish the value of shares of First Union. The evidence shows that the value of those shares has increased steadily at least in the last three years. Although plaintiff's witness, William Kirschenbaum, an investment banker, testified that the price of First Union's beneficial shares has increased since Unicorp began its accumulation in Spring of 1979, the plaintiff has not shown that these increases are more or less attributable to any particular factor. Kirschenbaum also testified that purchases of shares by an accumulator generally raises the value of the stock in the hands of other holders. However, defendants' witness, Al Gerard, also an investment banker, testified on the other hand, that his firm had conducted studies of the effect of defensive tactics such as the elimination of cumulative voting and found no discernible rise or fall in stock prices.

Again, any omission in the plaintiff's statement regarding the effect of the proposals on share value is amply compensated by Unicorp's repeated admonitions in its own proxy materials that it believes the amendments would have such an effect.

(b) *Unicorp's contentions directed at specific proposals*

The Court turns now to the plaintiff's contentions concerning specific proposals.

First, plaintiff contends that the proxy statement is misleading and omissive in its treatment of the proposal to disqualify trustees with competing and/or conflicting interests in the following particulars:

(1) The proposal is not described in the statement;

(2) The language of the proposal is "buried" in Exhibit A to the statement;

(3) The proposal is stated in such vague terms that a reasonable security holder cannot understand its nature and effect.

(4) The nature, effect and extent of the proposal are not described: in particular it does not disclose the "probable impact" of the proposal to disqualify the most qualified and experienced persons for the job.

Plaintiff's first contention is not well taken. The disqualification proposal and the reasons for it are described on pages 6–7 of the original proxy statement. As for the plaintiff's second contention, it appears appropriate for First Union to have appended to its proxy statement the full text of the proposed amendments. This procedure guards against any misleading impact of the narrative description. The doctrine of "buried facts" does not apply to the clear and prominent inclusion of the text in an appendix on the final two pages of the proxy statement pamphlet, the entirety of which, it must be presumed, a reasonable shareholder had read before voting his proxy.

Plaintiff's third contention concerns the technical terminology used in the amendment. Unicorp contends that the language is vague and not easily understandable. As defendants point out, vagueness may be a reason for voting against the proposal but not for claiming that the proxy materials are false, misleading or omissive.

There is considerable dispute about the meaning of the disqualification proposal. Unicorp contends that the proposal would disqualify several of those who are currently trustees. The evidence shows that the trustees genuinely differ with this assessment and believe that the language would not affect those who are currently on the Board. Unicorp contends further that the language could disqualify anyone investing in real estate. The Court is not in a position to determine the reach of the proposal's language but believes that Unicorp has, in any event, thoroughly aired this dispute in its own proxy materials:

The technical language of the proposal is included in the Exhibit to management's proxy statement and it is not easy to read or understand. We believe that burying the proposal in the back of the proxy statement without an explanation is not a full presentation. We have read it and it is so vague that it may prevent individuals knowledgeable in the real estate industry from acting as trustees. We have included below the technical proposal. See if you can make heads or tails of it. Do you know what "competes with the Trust for investments" means? It could be read so broadly as to include anyone investing in real estate. An explanation is needed. Only management can supply it.

In any event, it appears that the proxy materials issued by First Union adequately describe their position on the meaning and extent of the provision.

■ Plaintiff's fourth contention complains that the proxy materials, in order to avoid misleading the shareholder, should describe "the probable impact" of the disqualification proposal to disqualify "those persons most qualified by experience and training to have an understanding of the business operations of the Trust and most qualified to understand and supervise the activities of the officers of the Trust." One soliciting a proxy is not required to inform a shareholder of facts that it does not believe in good faith exist. The materials do not mislead a shareholder because they fail to state an interpretation of the proposed amendments that the defendants do not share.

Plaintiff next contends that the materials falsely state that the historical interpretation of existing Section 8.10 of the Declaration of Trust "never intended to allow Trustees to become associated with . . . a real estate company that . . . has business interests that conflict" with those of the trust. The Court believes that there is not a strong likelihood that the plaintiff can prevail at trial that the Board of Trustees have not, in fact, been of this opinion.

In its last objection to a particular statement in the proxy materials, Unicorp contends that the proxy statement, which recommends elimination of cumulative voting on the ground, among others, that cumulative voting may result in "conflict . . . disruptive to the Board's normal operation," is omissive in failing to disclose that, in the 20 years during which the trust's beneficiaries have enjoyed the privilege of voting cumulatively, no instance of disruptive conflict has occurred. Such a disclosure does not appear to be material, in view of the fact that, in the 20 years of the trust's existence, the existing cumulative voting provision has never been exercised. Plaintiff has not shown a substantial likelihood of prevailing on this claim.

(c) *Unicorp's contentions directed at the combined presentation of several proposed amendments in one "Unitary Proposal"*

■ In paragraphs (a) and (b) of the First Cause of Action of its complaint, plaintiff contends that the presentation of several disparate proposals in one "Unitary Proposal" (Proposal 1 of the Notice to Shareholders) creates the false impression that they are interdependent and collectively necessary, defeats the informed exercise of a shareholder's franchise by preventing the shareholder to approve some but not others of the disparate proposals and casts upon one opposing the proposals the burden of persuading fellow shareholders that each and all are without merit.

Upon examination, the proposals do not appear to be interdependent but do appear to be, in the opinion of the Board, related. SEC regulations clearly permit the grouping of related matters in a proxy. *See, e. g.,* 17 CFR § 240.14a–4(b)(1). The question presented is whether the grouping of the materials in this case constitutes a material misrepresentation that the proposals are interdependent and collectively necessary. The Court is unable to determine the probability of success on this claim. In any

event, Unicorp has aired its concern in this regard in its March 18 communication:

c. *Voting on the Proposal to Eliminate Cumulative Voting and the "Conflict" Proposal as a Single Item.* Without explanation or adequate justification, management has combined two very different proposals—the proposal to eliminate cumulative voting and the "conflict of interest" proposal—into a single item on its proxy card. Consequently, those shareholders who are in favor of one of these proposals but opposed to the other may be prevented from expressing their true preferences on both such proposals. Instead, they must vote for or against both as a unit. In our view, the proposals are unrelated from a shareholder's point of view, and, in the interests of corporate democracy and the proper exercise of shareholder's right to vote, must be presented as entirely separate items. Whatever management thinks about the proposals, they should not put you in a position where you cannot express your point of view on the separate issues.

It would appear that a shareholder misled by the original materials would be aware of the problem and able to vote against the proposal on that ground.

In sum, the Court concludes that, on the basis of the evidence before it at this time, the plaintiff has not shown a strong or substantial likelihood of persuading a trier of fact that the proxy materials issued by the defendants in this action are misleading or omissive in material respects.

### (2) *Irreparable Harm*

The Court next addresses the question whether plaintiff has demonstrated that it will suffer irreparable harm if immediate injunctive relief is not granted. Failure to grant the relief requested (or some lesser relief) will presumably result in the election taking place as scheduled with the voting of proxies by both sides. As defendants point out, there is a possibility that Unicorp will succeed in its solicitation and prevail at the election in which case an injunction will be no longer required. However, for the purposes of evaluating plaintiff's irreparable harm, the Court will assume that it will not prevail in the proxy fight.

Plaintiff contends that it will suffer irreparable harm in the form of a "freeze-out" of Unicorp by virtue of the effect of the amendments to prevent it from cumulating its votes to elect a trustee of its own choosing and thus protect its investment. Defendants contend however that this is not a case where the mistaken failure to grant preliminary relief cannot be later remedied. The Court agrees.

Injunctive relief is certainly appropriate in these cases. *Mills v. Electric Auto-Lite*, 396 U.S. 375, 383, 90 S.Ct. 616, 621, 24 L.Ed.2d 593 (1970). However, plaintiff has "the burden of establishing a clear case of irreparable injury . . . ." *Garlock, Inc. v. United Seal, Inc.*, 404 F.2d 256, 257 (6th Cir. 1968).

In *Plant Industries v. Bregman*, 490 F.Supp. 265 (S.D.N.Y.1980), the district court denied a preliminary injunction under similar circumstances, saying:

To allow an election to proceed in the face of allegations of improper solicitations and misleading proxy materials does not in and of itself work an irreparable injury on the party challenging the materials. The court possesses the power, if necessary, to void the election, order resolicitation and otherwise "unscramble" this kind of transaction.

*Id.* at 271 (footnotes omitted). See also *Jewelcor, Inc. v. Pearlman*, 370 F.Supp. 221, 252 (S.D.N.Y.1975). The Court believes this rule should be followed in this case.

Denial of the injunction here will not deprive Unicorp of the ownership of its shares or the rights it currently has to seek to protect itself in a proxy solicitation. Indeed, Unicorp has vigorously and adamantly conducted its own solicitation campaign to defeat the proposals it deems unwise over the past month. Any harm which befalls it by virtue of the election can be

remedied after a full trial on the merits and careful deliberations are had. Likewise, the fact that Unicorp personnel may be required to spend time monitoring the defendants' activities is not, in the Court's view, a damage that is irreparable. Any unlawful acts occurring after the election but before trial are best not anticipated by speculation on the Court's part. The Court reminds the parties that they may apply to the Court for relief in the event of occurrences that appear to impair the Court's ability to grant an effective post-trial remedy. At the present time, however, the Court is of the opinion that plaintiff has failed to carry its burden regarding irreparable harm.

### (3) *Harm to Others Stemming from Preliminary Injunctive Relief*

This case was filed on March 18, 1981. Discovery was confined to six days and evidence adduced at a truncated two-day hearing. The risk of an erroneous issuance of an injunction under such circumstances must be weighed against the harm, itself perhaps irreparable, the injunction may cause the parties enjoined. There exists the danger that shareholders may view an injunction inaccurately as a final determination of wrongdoing on the part of First Union and influence the election in this way. *See, e. g., Jewelcor, Inc. v. Pearlman,* 397 F.Supp. 221 (S.D.N.Y.1975); *Sherman v. Posner,* 266 F.Supp. 871, 874 (S.D.N.Y. 1966). The equities do not warrant undertaking such a risk here.

### (4) *The Public Interest*

The Court concludes as well that the public interest would not be served by the issuance of an injunction at this stage in the proceedings. Business entities are required to maintain procedures allowing for their shareholders to participate in the orderly governance of the entity. They are entitled to expect that their governing processes will proceed without judicial interference except in clear cases of abuse. The public interest is best served by allowing the election to go forward; if on a full record the decision is made that fairness has been thwarted, the public interest can still be protected.

### III. *Conclusion*

The Court has endeavored to examine all the claims of the plaintiff in support of its motion for preliminary injunction. Upon consideration of the evidence, the pleadings, memoranda and arguments of counsel, the Court is persuaded that plaintiff has not shown a strong or substantial likelihood or probability of prevailing on the merits, irreparable harm, that the issuance of a preliminary injunction would not cause substantial harm to others, or that the public interest would be served by issuance of injunctive relief. Accordingly, the Court holds that injunctive relief is not warranted at this time in this case.

### ORDER

Plaintiff's motion is not well taken and hereby is DENIED.

It is so ORDERED.