**Emanuel G. ROSENBLATT et al.,**
**Plaintiffs-Appellants,**

**v.**

**NORTHWEST AIRLINES, INC., et al.,**
**Defendants,**

**and**

**Northeast Airlines, Inc., and Storer Broadcasting Company, Defendants-Appellees.**

**No. 437, Docket 35602.**

United States Court of Appeals, Second Circuit.

Argued Dec. 3, 1970.

Decided Dec. 3, 1970.

1122

Burton L. Knapp, New York City, for plaintiffs-appellants.

George S. Leisure, Jr., New York City (Donovan, Leisure, Newton & Irvine, New York City, of counsel), for defendant-appellee Northeast Airlines, Inc.

David Hartfield, Jr., New York City (White & Case, New York City, of counsel), for defendant-appellee Storer Broadcasting Co.

Before FRIENDLY, SMITH and ANDERSON, Circuit Judges.

FRIENDLY, Circuit Judge:

This is an appeal by minority stockholders of Northeast Airlines, Inc. (Northeast) from an order of Judge Ryan in the District Court for the Southern District of New York refusing to enjoin Northeast and Storer Broadcasting Company (SBC), the majority stockholder of Northeast, from voting proxies in favor of a proposed merger of Northeast into Northwest Airlines, Inc. (Northwest) at a meeting called for October 26, 1970. Plaintiffs asked that

voting of the proxies be enjoined unless Northeast stockholders were furnished plaintiffs' "Proposed Supplement" to the Northeast proxy statement at least ten days in advance of the meeting. In view of the provision of the merger agreement entitling Northwest to terminate if stockholder approval was not obtained by December 31, 1970, we indicated from the bench that we proposed to affirm. However, since this litigation has had a past, see Stedman v. Storer, 308 F.Supp. 881 (S.D.N.Y.1969), and may have a future, we think it desirable to state just what we have decided and the reasons for it.

The litigation stems from an agreement, announced in principle on November 11, 1969, and embodied in a contract dated January 19, 1970, for the merger of Northeast into Northwest. The announcement stated, and the contract provided, that shareholders of Northeast would receive one share of Northwest for each five shares of Northeast. Since Northeast's stock had been selling at about 40% of the market price of Northwest's the announcement caused a sharp drop in the price of Northeast shares. See 308 F.Supp. at 883–884. At the same time, the market price of SBC, owner of 86% of Northeast's stock, advanced. The apparent inconsistency disappears when it is understood, first, that SBC's average cost for its Northeast shares was only $5.30 per share as against the approximately $7 it would realize on the basis of the then market value of Northwest shares and, second, that Northeast's heavy losses had made that company an albatross around SBC's neck and a merger of Northeast into Northwest could be expected to relieve SBC of this burden. Minority shareholders of Northeast brought actions attacking the proposed merger in the District Court for the Southern District of New York on the basis of alleged violations of § 10(b) of the Securities Exchange Act and SEC Rule 10b–5, and sought various forms of preliminary injunctive relief. These motions were de-

nied by Judge Frankel in the informative opinion already cited.

The Civil Aeronautics Board proceeded with the hearings concerning the proposed merger required by § 408 of the Federal Aviation Act, 49 U.S.C. § 1378. On August 4, 1970, Trial Examiner Park filed a decision recommending approval. Although the Northeast minority stockholders and others have sought review by the Board, 14 C.F.R. § 302.28, Northeast on September 23, 1970, sent out a Notice of Special Meeting in Lieu of Annual Meeting of Stockholders, to be held on October 26, 1970, accompanied by a Proxy Statement as required by § 14 of the Securities Exchange Act and the SEC's Regulation 14A.

In view of SBC's domination of Northeast through its 86% stock ownership, any attempt by the minority stockholders who opposed the merger to wage a proxy contest would have been futile. Instead they sought to have Northeast circulate a document entitled "Supplement Proposed on Behalf of Minority Shareholders of Northeast Airlines, Inc., of Proxy Statement dated September 22, 1970," which contained additional facts necessary in their judgment in order to make the Proxy Statement conform to the standards of Rule 14a–9. Northeast agreed to do this at its own expense if the Supplement were modified to make clear that it was not prepared or sponsored by management, which was inoffensive although hardly necessary in view of the changes in the cover page of the Supplement to which its proponents had already agreed, and if the proposed communication was "cleared by the SEC."

Not availing themselves of this offer, plaintiffs moved to enjoin Northeast and SBC from voting proxies at the October 26 stockholders' meeting of Northeast unless the Supplement was furnished at least ten days in advance. Judge Ryan held a hearing on October 14. Having determined to deny the motion, he signed, on October 22, an order containing findings of fact and conclusions of law substantially as proposed by the de-

fendants.[1] Plaintiffs made no application to stay the meeting either in the district court or here. However, they did file a notice of appeal and a motion, returnable in this court on November 9, for an order to enjoin any tally or certification of the vote. Before the return day the tellers had certified the vote as follows:

| For the merger | Shares |
|---|---|
| SBC | 5,756,943 |
| Others | 216,676 |
| | 5,973,619 |
| Against the merger | 64,050 |
| Not voting | 647,486 |
| | 6,685,155 |

The panel declined to grant either the plaintiffs' motion or SBC's oral request to dismiss the appeal as moot, but fixed an expedited schedule.

Although the Supreme Court left the question open in Mills v. Electric Auto-Lite Co., 396 U.S. 375, 385 n. 7, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), we shall assume *arguendo* in plaintiffs' favor that, in light of the recognition of the special function of "private enforcement of the proxy rules," J. I. Case Co. v. Borak, 377 U.S. 426, 432, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964), issuance of a management proxy statement which violated Regulation 14A could justify an injunction in a private action, even though, as here, a single corporation dominating the management owned so large a proportion of the stock that the proposal was certain to carry[2] if the

owner so willed. The argument for this on facts such as those here presented is rather strong, since a misleading proxy statement might cause a minority stockholder to lose, by inaction or action, the right to demand payment for his shares and appraisal thereof. Section 86 of the Massachusetts Business Corporation Law, Laws of Mass., ch. 156B, § 86, here applicable, requires a stockholder who wishes to exercise this appraisal right to file written objection before the vote on the proposed action is taken and to refrain from voting his shares in favor thereof.[3] To be sure, a plaintiff seeking to preserve this right for other stockholders is not asserting either a derivative claim, since action by the minority cannot affect the corporation unless the appraisal demands should be so numerous as to give the dominant stockholder a second thought, nor a direct one, since by hypothesis he knows enough facts to protect himself. However, we read *Borak* as recognizing a stockholder as something of a "private attorney general" to assist the SEC in enforcing § 14(a). See Studebaker Corp. v. Gittlin, 360 F.2d 692, 696–698 (2 Cir. 1966). We thus have no occasion to consider whether plaintiffs who are fully aware of the alleged misrepresentations would have standing to seek an injunction under § 10(b) and Rule 10b–5 to protect other minority stockholders from "selling" their Northeast stock for shares in Northwest rather than exercising their appraisal rights. Compare Mutual Shares Corp. v. Genesco, Inc., 384 F.2d 540, 546–547 (2 Cir. 1967); Vine v. Ben-

1. Since the judge did this in order to accommodate plaintiffs' desire for an expedited appeal, criticisms we have made on other occasions when district judges and referees have failed to prepare their own findings, see In re Flora Mir Candy Corp., 432 F.2d 1060, 1062, n. 2 (1970), are wholly inapplicable.

2. SBC owned 86% of Northeast's outstanding stock; Massachusetts law required a vote of two-thirds of Northeast's outstanding shares to approve the merger. Business Corporations Law, §§ 78 and 79(c).

3. We do not mean this portion of our opinion to indicate disagreement with Judge Tenney's conclusion in Miller v. Steinbach, 268 F.Supp. 255, 269–272 (S.D. N.Y.1967), that failure to take action required by state appraisal statutes is not a bar to a stockholder's recovering damages for violation of § 14 and the Regulation and rules thereunder. See also Voege v. American Sumatra Tobacco Corp., 241 F.Supp. 369, 375 (D.Del. 1965).

eficial Finance Company, 374 F.2d 627 (2 Cir.), cert. denied, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967).

Although Rule 14a–7 requires the management of any issuer making a proxy solicitation to mail "copies of any proxy statement, form of proxy or other communication" furnished by a security holder at the latter's expense, unless the issuer elects to furnish the security holder with a stockholders' list, this must be read in the light of other rules contained in Regulation 14A. Rule 14a–2 makes the Regulation applicable "to every solicitation of a proxy" and Rule 14a–1 defines "solicitation" to include "any request to execute or not to execute, or to revoke, a proxy" and the furnishing of a communication "under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy." The cover page of the Supplement, which advised stockholders that, whether or not they attended the meeting, their proxies would be returned on request, made the Supplement a "solicitation" within this definition. The Supplement was thus "soliciting material" subject to the filing requirements of Rule 14a–6(b), which plaintiffs made no attempt to meet. See Union Pacific R.R. v. Chicago & N. W. Ry., 226 F. Supp. 400, 408 (N.D.Ill.1964). Furthermore, it is exceedingly doubtful whether the statement that the material "has been prepared on behalf of Bruce Stedman and Carl H. Abraham, minority shareholders of Northeast who have intervened in pending Civil Aeronautics Board proceedings and who are plaintiffs in litigation described under the heading 'Shareholders' Suits,'" complied with the requirements of Schedule 14A, modest though these are. Only Stedman and Abraham were mentioned in the Supplement, but, in fact, the derivative actions which they had brought, purporting to represent all of Northeast's minority shareholders, were consolidated for all purposes with similar actions instituted by two other minority stockholders, Emanuel G. Rosenblatt and Minna Witkoff, and the motion to enjoin the voting of proxies was made in the consolidated action. Hence, there is a serious question whether the latter were not "associates" within Item 4(a) (4). Furthermore, the proponents of the Supplement did not comply with the requirement of Item 4(a) that the material "describe briefly any substantial interest, direct or indirect, by security holdings or otherwise" of each of the persons on behalf of whom the solicitation was made and their "associates"; there was no statement of how many shares were owned, surely a material fact for recipients of the Supplement to know. Although Rule 14a–7(b) (3) says that "neither the management nor the issuer shall be responsible" for a proxy statement, form of proxy or other communication mailed at the request of other security holders, this does not necessarily mean that the management or issuer is relieved of responsibility for mailing material where it knew the security holder had failed to comply with the filing requirements of Rule 14a–6 as developed in Schedule 14A. Because of their failure to comply with Rule 14a–6 and Schedule 14A, the proponents of the Supplement were thus not entitled to demand that the Northeast management perform any of the acts specified in Rule 14a–7.

That, however, does not end the case since there is still the question whether plaintiffs established that the Proxy Statement as sent to the stockholders was so false or misleading as to require the district court to enjoin the voting of proxies or, since that is now impossible, to oblige this court to annul the vote taken at the meeting and order a new one. It is worthwhile to observe that this issue comes before us in the context of our limited review of a district judge's exercise of discretion with respect to a temporary injunction and not, as in Miller v. Steinbach, 268 F. Supp. 255 (S.D.N.Y.1967), upon a motion to dismiss a complaint or grant summary judgment.

The point most strongly pressed by plaintiffs in brief and argument

is that the Proxy Statement did not disclose that in the five trading days July 23–29, 1969, six SBC directors, four of whom were also directors of Northeast, made open-market purchases of SBC stock.[4] The significance of this is said to lie in the fact that at 4 P.M. on July 25, 1969, the Civil Aeronautics Board released an order in Docket 18257, Southern Tier Competitive Nonstop Investigation, No. 69–7–135, wherein, reversing its hearing examiner, it awarded a Miami-Los Angeles non-stop route to Northeast on the ground that Northeast was in greater need of route strengthening than other applicants. This award arguably increased Northeast's attractiveness as a merger candidate and hence enhanced SBC's chances of getting out from under the burden of absorbing Northeast's losses.[5] Particular stress is placed on the purchases of July 23–25 since, it is contended, these must have been based on advance information about the CAB's prospective action and the effect it would have in enhancing Northeast's attractiveness as a merger partner.

While purchases of SBC stock by its directors on the basis of inside information may give rise to Rule 10b–5 liability to sellers of SBC stock, see SEC v. Texas Gulf Sulphur Corp., 401 F.2d 833 (2 Cir. 1968), cert. denied, sub nom. Coates v. SEC and Kline v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), we do not believe the facts concerning these purchases, however piquant, "might have been considered important by a reasonable shareholder who was in the process of deciding how to vote" with respect to the merger of Northeast into Northwest, the test laid down in Mills v. Electric Auto-Lite Co., *supra,* 396 U.S. at 384, 90 S.Ct. 616.[6] The Proxy Statement contained several references to SBC's 86% ownership of Northeast and annexed a copy of an agreement between SBC and Northwest, also summarized in the text, whereby SBC agreed, among other things, that it would vote its Northeast stock in favor of the merger and that the Northwest stock otherwise receivable by it should be reduced if Northeast's losses between January 1, 1969, and the consummation of the merger exceeded $12,700,000.[7] It also mentioned the Northeast minority stockholder suits complaining that the merger terms were unfair as to them and that SBC and certain of its officers and directors had "violated fiduciary and statutory duties as controlling shareholder and directors of Northeast." It revealed that seven of the persons proposed for election as directors of Northeast pending consummation of the merger were directors of SBC or members of the Storer family; that all of these, including the four who had added to their SBC holdings between July 23 and 29, 1969, were owners of SBC's stock, several in large amounts, and held none of Northeast's; that five of the remaining ten candidates also owned some SBC stock; and that, with a single exception, none of these other directors owned significant amounts of Northeast

---

4. While these were duly reported in Form 4 statements filed with the SEC and the New York Stock Exchange pursuant to § 16(a) of the Securities Exchange Act, we agree with plaintiffs that this would not be a sufficient answer if the fact were material.

5. The Hearing Examiner in the CAB merger proceeding found that the decision to explore a merger was not made until a meeting of Northeast's Executive Committee on September 24, 1969. However, the record here contains some evidence that merger was being considered at an earlier date but that the idea was kept quiet for fear of adversely affecting the decision in the *Southern Tier* route case, in which Northeast had repudiated the suggestions of competing carriers that it was seeking the route as "merger bait."

6. Mr. Justice Harlan also spoke of the criterion as being whether the defect had "a significant *propensity* to affect the voting process." (Emphasis in original), *id.*

7. The formula was that 75% of such excess losses up to $8,000,000 and 100% of such excess losses above $8,000,000 should be divided by $35.50, the then market value of Northwest's shares.

stock. These and other statements gave the minority stockholders ample notice that SBC was strongly promoting the merger which it deemed to be in its interest as the dominant stockholder of Northeast, while other stockholders were opposing the merger and claiming that SBC was acting in violation of its trust. It was this information, along with the many other facts contained in the Proxy Statement, that was essential for the Northeast stockholders to make an informed decision. The important knowledge was the extent to which the Northeast directors who recommended approval of the merger were themselves likely to benefit through its effect upon SBC, which was actively sponsoring it. And this, in turn, was dependent upon the total amount of SBC stock that each Northeast director owned, not upon the dates and circumstances of his acquisition; knowledge that a number of SBC-Northeast directors had increased their holdings of SBC stock in July 1969 in hopes that the Miami-Los Angeles route award would increase the prospects of merger would not have had "a significant *propensity*" to influence a minority Northeast stockholder to vote against a merger favored by SBC if he was otherwise inclined to approve it.

Similar considerations apply to other alleged deficiencies of the Proxy Statement with respect to SBC. It is argued that the Statement should have revealed that SBC's Northeast stock had an average cost of only $5.30 per share so that at the market price prevailing for Northwest shares on November 10, 1969, the day before the merger agreement in principle was announced, SBC stood to gain some $10,000,000 on its investment whereas persons holding Northeast shares purchased between July 1, 1968

and September 30, 1969, would sustain a loss.[8] But, once the Northeast stockholders had been sufficiently alerted to SBC's active interest in promoting the merger and the charges that had been made against it in the stockholders' suits, it was for each of them to determine, on the basis of his own view of the future of the merged company and his knowledge of the cost of his own stock, whether he preferred to go along with the merger or assert his appraisal rights. Plaintiffs also criticize the statement, "Northeast has no obligation to pay any brokerage commission or finder's fee in connection with the merger," as not being the whole truth, since SBC had entered into an agreement on July 17, 1970, to pay F. Eberstadt & Co., Inc., for its services, a fixed fee of $50,000 and an additional $200,000 contingent upon consummation of the merger. While it would surely have been better if the Proxy Statement had revealed this, disclosure that SBC was assuming a burden that would normally have rested on Northeast would have been simply another indication of SBC's eagerness to have the merger carried out, a fact already sufficiently indicated.

There is an essential distinction between this case and *Electric Auto-Lite*, which plaintiffs seek to obscure. There the proxy statement did not reveal that all of Auto-Lite's directors, who had recommended the merger with Mergenthaler Linotype Company, were nominees of that company. By omitting this vital information, the proxy statement failed to alert the Auto-Lite stockholders that their proposed merger partner was already in practical control of their own company and now—through its nominees —was recommending approval of a merger whose terms it had been in a position to dictate. The district court prop-

---

8. Since Northwest's stock had declined by more than 50% between November 10, 1969 and June 30, 1970, which was disclosed, an alternative claim was that the Proxy Statement should have revealed that an increase of only 25% in the market price of Northwest shares would make SBC whole whereas Northwest's stock must rise by 400% to produce the same happy result for persons who bought Northeast shares at the higher prices prevailing between July 1, 1968 and September 30, 1969.

erly ruled that in such circumstances there was a material omission as a matter of law. Here, by contrast, there is and could be no suggestion that Northwest in any way dominated Northeast. Plaintiffs do contend that the merger negotiations with Northwest were carried on solely by Storer-dominated directors of Northeast and that this fact should have been disclosed. However, there is no reason to believe that stockholders assume that all directors participate in corporate negotiations. And whatever other significance the point may have relates to the general assertions that the Proxy Statement did not contain everything it might have contained to emphasize that SBC might have been—with reason—more eager for the merger than other Northeast shareholders who felt assured that SBC would keep the company afloat, and that SBC consequently might not have pressed quite so hard for the best obtainable terms at the risk of losing the deal, even though its financial interest was infinitely larger than any other stockholder's. Mere failure to say everything on this score that opponents of the merger would have wished is not such an omission "to state any material fact necessary in order to make the statements therein not false or misleading" under Rule 14a–9 as to require an injunction that might thwart the desires not only of SBC but of other Northeast stockholders not sharing the opponents' views. Cf. Electronic Specialty Co. v. Int'l Controls Corp., 409 F.2d 937, 948 (2 Cir. 1969). If the opponents want the stockholders to be told more, Rule 14a–7 provides a remedy, at least when, as here, the omitted facts are known to them. But for reasons best known to themselves plaintiffs did not take the simple steps necessary for its proper invocation.

■ Most of plaintiff's other contentions relate to statements or failure to make statements concerning Northeast's enormous losses at various times during 1969 but do not suggest that the Proxy Statement did not accurately disclose these. Whatever the facts about this may be and whatever consequences they may have with respect to damage actions under § 10(b) and Rule 10b–5 by persons who bought Northeast stock at the high prices prevailing during the early part of 1969, they did not require a grant of the interlocutory relief here sought. In contrast to false or misleading statements in the Proxy Statement itself, these actions or omissions in 1969 could hardly have affected a stockholder's vote a year later when all the facts with respect to Northeast's finances were disclosed. And whereas false or misleading statements in the Proxy Statement might affect the decisions of *all* minority stockholders whether to exercise their appraisal rights, the alleged violations of § 10(b) and Rule 10b–5 would be relevant only to some. Whether or not the standards of causation under Section 14 (a) and Rule 10b–5 are different in actions for damages, see Jennings & Marsh, Securities Regulation: Cases and Materials 1001–02 (1968), past violations of Rule 10b–5 may thus stand less strongly than violations of § 14(a) when the issue is whether a sound exercise of discretion requires enjoining the meeting at which the proxy statement was to furnish a basis for informed action.

Affirmed.