**MANAGEMENT ASSISTANCE INC., Plaintiff,**

v.

**Asher B. EDELMAN, Arbitrage Securities Company, Plaza Securities Company, Minor Associates, L.P., Raymond French, Charles P. Stevenson, Jr. and Clark R. Mandigo, Defendants.**

No. 84 Civ. 667 (JFK).

United States District Court, S.D. New York.

March 21, 1984.

Rosenman, Colin, Freund, Lewis & Cohen, New York City, for plaintiff; Gerald Walpin, New York City, of counsel.

Schulte, Roth & Zabel by John S. Martin, Jr., New York City, for defendants except Charles P. Stevenson, Jr.

Newman, Tannenbaum, Helpern, Syracuse & Hirschritt by Ralph A. Siciliano, New York City, for defendant Charles P. Stevenson, Jr.

#### OPINION AND ORDER FILED UNDER SEAL

KEENAN, District Judge:

This action was brought by Management Assistance Inc., ("MAI") against Asher B. Edelman, Raymond French, Charles P. Stevenson, Jr., Clark R. Mandigo, Arbitrage Securities Company ("Arbitrage"), Plaza Securities Company ("Plaza") and Minor Associates, L.P. ("Minor") for violations of

sections 13(d), 14(a) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. Sections 78m(d), 78n(a) and 78t(a), and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. Sections 1961–1968. Injunctive relief and damages are sought.

MAI is a New York corporation which is engaged in the development, manufacturing and marketing of information processing systems and in furnishing repair, preventive maintenance and reconditioning service for information processing equipment. Arbitrage, Plaza and Minor are limited partnerships under Edelman's control that own MAI stock. Through these holdings Edelman beneficially owns approximately 12.8% of the outstanding shares of MAI common stock. Arbitrage, Plaza, Minor and Edelman have solicited proxies from the shareholders of MAI for the election of their nominees, French, Stevenson, Mandigo and Edelman to the board of directors at the meeting of shareholders scheduled for March 14, 1984.

The original complaint and a motion for expedited discovery were filed on January 30, 1984. On February 2, defendants filed a motion to dismiss MAI's original complaint pursuant to Fed.R.Civ.P. 12(b)(6), or in the alternative for an order pursuant to Fed.R.Civ.P. 26(c) limiting discovery. MAI filed an amended complaint on February 6. Defendants filed a motion to dismiss the amended complaint on February 9. By order of this Court dated March 6, 1984, 584 F.Supp. 1016, defendants' motion to dismiss was denied in all respects as to all defendants except defendant Stevenson. The section 13(d) claims against Stevenson were dismissed. On March 8, plaintiff was granted leave to file a second amended complaint that added two claims to the action.

On February 10, defendants answered the first amended complaint and asserted three counterclaims against MAI. Plaintiff filed a motion to dismiss the first counterclaim on February 14. That motion was granted by order of this Court dated March 6.

On March 6, 1984, plaintiff and defendant filed cross-motions for preliminary injunctive relief relating to the March 14, 1984 meeting of shareholders. Oral argument on both of these motions was heard on March 9. The Court took expert testimony relating to plaintiff's motion on March 12. The next day the Court issued an order denying plaintiff's request for relief. The Court did not rule on defendants' motion, as defendants had requested that their motion be considered only if plaintiff's motion was granted. This opinion sets forth the reasoning underlying the Court's March 13 order with more particularity than time allowed on that date.

Plaintiff's motion sought an injunction preventing defendants from (i) acquiring or attempting to acquire any additional shares of MAI common stock; (ii) soliciting or arranging for the solicitation of proxies for any MAI common stock; (iii) voting any shares of MAI common stock; (iv) otherwise using or attempting to use any MAI common stock as a means of controlling or affecting the management of MAI; (v) taking or attempting to take any other steps in furtherance of the unlawful scheme to acquire control of MAI; and (vi) selling or otherwise disposing of, pledging or otherwise encumbering any MAI common stock that they own, directly or indirectly, except in accordance with a plan approved in advance by the Court.

Plaintiff urged seven of the nine claims set forth in its second amended complaint as a basis for the relief sought. Two of the claims allege violations of section 13(d). The first claim is that defendants made a false and misleading statement in their Schedule 13D with regard to the purported interest of two companies in acquiring all or part of MAI. The second claim alleges failure to fully disclose in the Schedule 13D the source of funds used to purchase MAI stock. The next five claims involve violations of section 14(a). The first of these claims alleges that defendants' proxy statement contained a false and misleading statement with regard to the purported interest of the two companies. The next

claim is for failure to disclose in the proxy statement that partnership securities were sold without a registration statement. Another claim alleges failure to disclose in the proxy statement that the partnerships comprise a single investment company in violation of the Investment Company Act. The final section 14(a) claims allege failure to disclose that defendants employed materially false, misleading and deceptive press releases to cause a rise in the price of the stock of Canal-Randolph Corporation, ("Canal-Randolph") of which three of the defendant nominees are directors, and that these activities violate section 10(b) of the Exchange Act and rule 10b-5, promulgated thereunder.

*Standard to be Applied*

■ The question presented to this Court by plaintiff's motion is whether plaintiff has established that it is entitled to preliminary injunctive relief on any of the claims listed above. To establish that it is entitled to such relief, a plaintiff must show possible irreparable injury and either (1) probable success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting preliminary relief. *E.g. Mattel, Inc. v. Azrak-Hamway International, Inc.,* 724 F.2d 357, 359 (2d Cir.1983); *Jackson Dairy, Inc. v. H.P. Hood & Sons,* 596 F.2d 70, 72 (2d Cir.1979); *Condec Corporation v. Farley,* 573 F.Supp. 1382, 1385 (S.D.N.Y.1983).

■ The Court recognizes that "serious questions going to the merits" may exist in this action. Such questions, standing alone, however, do not justify injunctive relief. Unless the balance of hardships tips decidedly in favor of the movant, the Court need not determine whether serious questions presenting a fair ground for litigation exist. *Buffalo Courier-Express,* *Inc. v. Buffalo Evening News, Inc.,* 601 F.2d 48, 58 (2d Cir.1979). To prove that the balance of hardships tips in its favor, a movant must show that the harm it would suffer without the relief sought is decidedly greater than the harm its opponent would suffer if injunctive relief was granted. *Buffalo Forge Co. v. Ampco-Pittsburgh Corp.,* 638 F.2d 568, 569 (2d Cir. 1981).

A preliminary injunction enjoining defendants from voting any shares of MAI stock at the meeting of shareholders for the election of directors would cause severe hardship to defendants and those shareholders whose proxies defendants hold. *See Standard Metals Corp. v. Tomlin,* 503 F.Supp. 586, 603 (S.D.N.Y.1980); *cf. Rosenblatt v. Northwest Airlines,* 435 F.2d 1121, 1128 (2d Cir.1970) (injunction against majority shareholder from voting proxies in favor of proposed merger might "thwart the desires" not only of the majority shareholders, but of other shareholders not sharing opponents' views); *Electronic Specialty Co. v. International Controls Corp.,* 409 F.2d 937, 948 (2d Cir.1969) (deprivation of voting rights detrimental). They would essentially be disenfranchised by such an order. *See Kennecott Copper Corp. v. Curtiss-Wright Corp.,* 584 F.2d 1195, 1202 (2d Cir.1978); *Willoughby v. Port,* 277 F.2d 149, 150 (2d Cir.1960). The hardship alleged by plaintiff, which is essentially denial of fully informed corporate suffrage, is not greater than the hardship that would result from denial of the right of corporate suffrage altogether.[1] As plaintiff has not satisfied the serious questions and balance of hardships prong of the preliminary injunction test, it would be improper for this Court to issue a preliminary injunction unless plaintiff has satisfied the probable success on the merits alternative with regard to any of its claims for relief.

---

1. An additional hardship to defendants may result from the issuance of an erroneous injunction at this stage. Shareholders may view an injunction as a final determination of wrongdoing and be unduly influenced by it. *Unicorp Financial Corporation v. First Union Real Estate Equity and Mortgage Investments,* 515 F.Supp. 249, 263 (S.D.Ohio 1981); *Jewelcor Incorporated v. Pearlman,* 397 F.Supp. 221, 252 (S.D.N.Y. 1975); *D-Z Investment Co. v. Holloway,* [1973–74 Transfer Binder] (CCH) Fed.Sec.L.Rep. 94, 588, at 96, 061–62 (S.D.N.Y.1974); *see Kennecott Copper Corp. v. Curtiss-Wright Corp., supra,* 584 F.2d at 1200.

*The Section 13(d) Claim and the Section 14(a) Claim Regarding the Purported Interest of Two Companies*

Two of plaintiff's claims involve statements made in defendants Schedule 13D and proxy materials that purport to reflect statements made by Edelman at the January 12, 1984 meeting of the Board of Directors of MAI concerning the interest of two companies in purchasing all or part of MAI. The first statement that plaintiff claims violates section 13(d) was made in Amendment No. 5 to the Schedule 13D, filed on behalf of all defendants except Stevenson. That statement supplements Item 4 of the defendants' Schedule 13D, the purpose of transaction section, and reads as follows:

> On Thursday, January 12, 1984, Mr. Edelman met with the Board of Directors of the Company at its invitation. During the meeting, Mr. Edelman informed the Board that he is aware of two companies, each of which would be interested in exploring the possibility of an acquisition of all or part of the company or its businesses. Raymond P. Kurshan, the Chairman of the Company, stated at the meeting that the Company would be willing to meet with these potential purchasers and suggested that Mr. Edelman request them to contact the company and its investment bankers.

Plaintiff contends that this disclosure was not required by section 13(d) and was made for the unlawful purpose of misleading the public.

■■■ Section 13(d)(1)(C) requires disclosure by the acquirer of five per cent or more of an issuer's securities of plans or proposals to make a change in an issuer's business or corporate structure. If the presentation by Edelman at the meeting did not qualify as a proposal or plan, it was not a required disclosure under section 13(d). The fact that a disclosure is not required, however, does not necessarily make the disclosure misleading.[2] Plaintiff argues that the fact that the information conveyed by Edelman was not a proposal and, therefore, not a required disclosure under section 13(d), compels the conclusion that the statement was made for the unlawful purpose of misleading the investing public. Defendants offer an alternative explanation. They contend that the disclosure was made to avoid potential civil or criminal liability under section 10(b) and rule 10b–5. Edelman claims that because he had been made privy to inside information at the board of directors meeting he thought that he should disclose that information publicly before he purchased more stock, which he subsequently did. Although the mere receipt of inside information does not place a duty on the recipient to disclose that information before trading on it, *see Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 13–14 (2d Cir.1983), the law is not clear as to whether someone in Edelman's position is required to disclose inside information that he obtained at a board of directors meeting before purchasing or selling securities. *See United States v. Newman*, 664 F.2d 12, 18–19 (2d Cir.1981) (trading in securities of company that is merger target of client of investment banking firm on information obtained by employees of investment banking firm could be found to constitute criminal violation of section 10(b) and rule 10b–5). The Court finds that the law regarding Edelman's potential 10b–5 liability is sufficiently unclear that the fact that the statement may not have been a required Schedule 13D disclosure does not compel the conclusion that the disclosure was wrongfully motivated.

The statement that plaintiff claims violates section 14(a) and rule 14a–9 was contained in defendants' proxy statement in opposition to management. It reads as follows:

---

**2.** The allegedly unnecessary disclosure here is distinguishable from the unnecessary disclosure in *Trane Co. v. O'Connor Securities,* 561 F.Supp. 301, 308 (S.D.N.Y.1983). Judge Carter found that disclosure misleading because the possibility of defendant actually carrying out his announced plan was too slim to warrant its inclusion as an option under Item 4. Here Edelman has actively sought an acquirer of MAI.

we have recently referred the management to two potential purchasers which were identified by Salomon Brothers Inc., and which have expressed an interest in the Company's service business and a willingness to meet with management of the Company to explore the possibility of an acquisition of part or all the Company or its businesses.

Plaintiff claims that this statement violates rule 14a–9, which makes it unlawful to solicit proxies by means of any communication "containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."

Plaintiff alleges that both of these statements are false, as defendants were aware of no company interested in the possibility of acquiring all of MAI. Plaintiff further alleges that the statements are misleading, because the following facts necessary to make the statements made not misleading were omitted: (1) that neither company mentioned by Edelman to the board of directors had any specific proposal or offer to purchase any part of MAI, (2) that defendants knew of no potential purchaser with a serious interest in acquiring any part of MAI for a price at which the shareholders would receive the full value of the assets of the company and (3) that Edelman had been advised by management that it had been interested in receiving and considering proposals which would result in the shareholders receiving maximum value for their shares.

 Plaintiff has not established probable success on the merits of its claim that the above allegedly omitted facts are necessary to prevent the statements from being misleading. The language, "exploring the possibility," is tentative in nature. It does not suggest that a definite offer had been made. Neither statement suggests that the potential purchasers would be willing to make an acquisition for a price at which the shareholders would receive the full val-

ue of the assets of the company for their shares. Nor do the statements suggest that management has not been interested in receiving proposals which would result in shareholders receiving maximum value for their shares. While inclusion of the allegedly omitted facts may have given shareholders a better perspective from which to evaluate the statements, their omission did not make the statements misleading. "[F]air accuracy, not perfection" conveying a "sufficiently accurate picture so as not to mislead" is the standard by which statements in securities filings are judged. *Kennecott Copper Corp. v. Curtiss-Wright, Corp., supra,* 584 F.2d at 1200 (citing *Crane Co. v. Westinghouse Air Brake Co.,* 419 F.2d 787, 800 (2d Cir.1969), *cert. denied,* 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970)). It is not necessary to state obvious conclusions, implicit assumptions or facts that are self evident. *Rodman v. Grant Foundation,* 608 F.2d 64, 71 (2d Cir.1979). In evaluating these allegedly misleading omissions, the Court heeds the recently quoted admonition of Judge Friendly that in enacting the securities laws "Congress intended to assure basic honesty and fair dealing, not to impose an unrealistic requirement of laboratory conditions." *GAF Corporation v. Heyman* [current] (CCH) 724 F.2d 727, Fed.Sec.L. Rep. 99, 585 at 97, 310 (2d Cir.1983) (quoting *Electronic Specialty Co. v. International Controls Corp.,* 409 F.2d 937, 948 (2d Cir.1969).

Unlike the alleged omissions, defendants' statements concerning the interest of the two companies in acquiring "all" of MAI, if false, is an affirmative misstatement. The statements purport to reflect what was said at the board of directors meeting held on January 12, 1984. The testimony and evidence presented indicate that the statements do this. The fact that Edelman said at the meeting that "it was a very early time" to determine the extent of the companies' interest and that he could not yet say "whether they meant all or part or anything" does not, as plaintiff argues, indicate that Edelman knew the reference to

"all" in the SEC filings was false. The phrase "exploring the possibility" adequately reflects his understanding that the interest of both companies was still tentative.

The testimony also demonstrates that what Edelman said at the meeting reflects what Michael Zimmerman, Edelman's contact at Salomon Brothers, told Edelman concerning the interest of two companies. Zimmerman told Edelman that the two companies were interested in exploring the possibility of acquiring "all or part" of MAI (Dep. of Zimmerman pp. 125, 134–35; Dep. of Edelman pp. 151–52). Thus the statements challenged reflect, as they purport to do, Edelman's awareness of the extent of the two companies' interest. The testimony also indicates, however, that at the time of the board meeting referred to in the statements, neither of the two companies had actually granted permission for their names to be used as potential purchasers of "all" of MAI. (Dep. of Mann pp. 11–12; Dep. of Reiser pp. 19–20; Dep. of McCabe pp. 25–26).

■ A misstatement or omission must be the result of knowing, reckless or negligent conduct for it to be actionable under rule 14a–9. *Plant Industries v. Bregman*, 490 F.Supp. 265, 269 & n. 16 (S.D.N.Y.1980). For the alleged misstatement in the Amendment No. 5 to be actionable the defendants must have been aware or reckless in not being aware that it was inaccurate. Without such knowledge the statement could not have been calculated to achieve the improper fraudulent purposes that plaintiff alleges.

■ No evidence has been presented to the Court, however, that demonstrates that the defendants should have known or were negligent in not knowing that the information conveyed to Edelman by Salomon

Brothers was incorrect.[3] Plaintiff argues that Edelman and the partnerships retained Salomon Brothers and that Salomon acted in concert with defendants for the purpose of enabling them to attribute the false and misleading statements to Salomon. To support this allegation, plaintiff notes that Salomon was retained to render financial advisory and investment banking services to the defendants in connection with their investment in MAI stock and, that on February 2, 1984, the day that the proxy statement was released, Salomon resigned this engagement, demanding $50,000, the entire retainer fee agreed upon. Plaintiff also cites the testimony of Michael Zimmerman which reveals that Edelman told Salomon that he wanted to mention Salomon's belief that certain of its clients might have an interest in an acquisition of all or part of MAI in defendants' proxy materials. (Dep. of Zimmerman pp. 82–83).

These facts, however, do not indicate that Salomon was acting in concert with defendants, through Zimmerman, when it told Edelman that the two companies were potentially interested in acquiring all of MAI or that Edelman was negligent in failing to discover that Zimmerman's statements to him concerning the interest of the two companies may not have literally reflected what was actually expressed by representatives of the two companies to Zimmerman's colleagues.

The agreement between Salomon Brothers and defendants provided for termination by either party at any time, with or without cause. The testimony indicates that Salomon insisted on this arrangement because it wanted to be released from the engagement with defendants if one of its corporate clients sought its representation in connection with a possible acquisition of MAI. (Dep. of Zimmerman p. 25). On February 3, 1984, Salomon terminated the

---

3. Plaintiff's brief cites the deposition of an employee of MAI to support the proposition that defendants knew that TRW was only interested in MAI's service business. On the pages cited, the employee relates what MAI's investment bankers were told by TRW representatives concerning their conversations with Salomon Brothers. The Court does not question plaintiff's position that TRW did not actually grant permission to have its name used in connection with an acquisition of all of MAI at the time in question. There is no evidence, however, that this was communicated to Edelman.

relationship after one of these clients approached Salomon, concerning its retention in connection with a possible acquisition of MAI. (Dep. of Zimmerman p. 138; Ex. 1 to Plaintiff's Exhibit 1).

The retainer agreement provided for payment of the fee upon signing of the agreement. The fact that an amount due upon signing was billed a few months after that date when the relationship was terminated does not demonstrate that the retainer arrangement had an illegal purpose. Finally, the fact that Edelman solicited names of companies that Salomon believed would be interested in pursuing an acquisition of all or part of MAI does not suggest that Salomon did not produce those names in good faith.

At most, the evidence reflects that the source of Edelman's information, Salomon Brothers, made an inaccurate assessment of the interest of the two companies. The testimony, however, suggests that Salomon's assessment of the two companies interest may have been correct. Although neither of the representatives of these companies testified that they had actually expressed an interest in all of the company to Salomon Brothers, they both testified that they had entertained the possibility of acquiring all of MAI. (Dep. of Mann pp. 58–59; Dep. of Bernold p. 32).

These innocent facts cannot be bolstered into unlawful activity by reading inferences into them that are unsupported by the record. *See Plant Industries v. Bergman, supra*, 490 F.Supp. at 268. *Weinberger v. Kendrick*, 451 F.Supp. 79, 84 (S.D.N.Y. 1978). Plaintiff alleges that the statements in Amendment No. 5 and the proxy statement were made for the improper purposes of (1) manipulating the price of MAI stock, (2) misleading MAI shareholders and potential MAI shareholders into believing that defendants had taken steps to benefit the shareholders of MAI and that management would not have taken such steps without Edelman and (3) soliciting proxies for the election of their nominees as directors of MAI upon the basis of false and misleading

statements. These allegations do not make otherwise neutral facts actionable.

Plaintiff has not established probable success on the merits of its claim that the alleged misstatement was the result of knowing, reckless or negligent conduct of the defendants. The Court, therefore, need not address the issue of whether the alleged misstatement is materially misleading. Plaintiff, having failed at this stage to show probable success on the merits of a necessary element of each of these claims, is not entitled to preliminary relief on either of the claims regarding the purported interest of the two companies.

*The Section 13(d) Claim Regarding the Disclosure of the Source of Funds*

Plaintiff claims that it is entitled to preliminary injunctive relief because defendants did not disclose substantial borrowings that enabled them to purchase MAI stock in their Schedule 13D. Section 13(d) requires disclosure of

> the source and amount of the funds or other consideration used or to be used in making the purchases, and if any part of the purchase price is represented or is to be represented by funds or other consideration borrowed or otherwise obtained for the purpose of acquiring, holding or trading such security, a description of the transaction.

The section entitled "Item 3. Source and Amount of Funds or Other Consideration" in defendants' Schedule 13D filed in connection with their October 24, 1983 purchase of MAI stock stated the number of shares each partnership purchased and that "in each case such shares were purchased with the respective partnership's partnership funds and are held in margin accounts at the Pershing Division of the Donaldson Lufkin and Jenrette Securities Corporation ("Pershing")." Plaintiff contends that this disclosure is insufficient because it fails to disclose that the partnerships had previously deposited in their Pershing accounts funds obtained in March, 1983 from loans from Citibank made to them through Edelman.

Both parties agree that in March, 1983 Arbitrage and Plaza borrowed a total of 12 million dollars from Citibank [4] to refinance the purchase of large amounts of Canal-Randolph stock. That stock was pledged as collateral for the Citibank loans. The proceeds from these loans were placed in the respective partnerships' partnership accounts at Pershing, which had originally financed the purchase of the Canal-Randolph stock. The purpose of the loans, according to lending documents at Citibank, was to increase the trading ability and liquidity of the partnerships, both of which had been impacted by the holding and purchase of sizeable blocks of Canal-Randolph stock and to enable them to take advantage of investment opportunities. Neither side disputes that the proceeds of the loans were used to buy stock. Plaintiff argues, however, that because the money was borrowed with the purpose of acquiring stock and stock was acquired with it, the loans must be disclosed in defendants' Schedule 13D with regard to their acquisition of MAI stock.

The purpose of the disclosure of source of funds requirement of section 13(d) is to enable shareholders and potential shareholders to make decisions which might be affected by information respecting the source of a major shareholder's investment funds. *See Purolator, Inc. v. Tiger International*, 510 F.Supp. 554, 555–56 (D.D.C. 1981). This purpose is served by requiring disclosure of loans, the proceeds of which are used to purchase securities for which Schedule 13D must be filed. Courts have not extended this disclosure requirement, however, to include all corporate borrowings obtained to conduct ongoing business. *See Trane Co. v. O'Connor Securities*, 561 F.Supp. 301, 309 (S.D.N.Y.1983); *Standard Metals Corp. v. Tomlin*, 503 F.Supp. 586,

604 (S.D.N.Y.1980); *Jewelcor v. Pearlman*, 397 F.Supp. 221, 241 n. 10 (S.D.N.Y.1975).

Arbitrage and Plaza are investment partnerships. The acquisition and sale of securities is part of their ongoing business. For them, "borrowings for the purpose of acquiring stock" are loans for the purpose of carrying on their business activities. A requirement that any borrowing for the purpose of acquiring stock be included in their Schedule 13D with respect to their acquisition of MAI stock, would essentially be a requirement that they disclose all corporate borrowings regardless of whether they had any relationship to the purchase of MAI stock. Although the Court recognizes that use of borrowed funds for one purpose, frees other funds for the use of another purpose, it is reluctant to extend the section 13(d) disclosure requirement to include such borrowings. Under such a rule essentially all corporate borrowings whether or not they were made for the purpose of acquiring the stock in question would have to be disclosed. Thus, despite the language in a number of cases that "borrowings for the purpose of acquiring stock" [5] must be disclosed, this Court reads the statutory requirement literally, as referring to borrowings for the purpose of acquiring the stock with respect to which the Schedule 13D is filed. Plaintiff, therefore, must show probable success on the merits of its claim that the loan proceeds were used to purchase MAI stock.

Between March 26, 1983, the date the loans were made, and September 29, 1983, the date of the first purchase of MAI stock, Plaza and Arbitrage purchased $368,691,-000 of corporate equity and debt securities in 4,542 transactions and sold $371,679,000 of such securities in 4,721 transactions. Plaintiff has not shown that the 12 million dollars borrowed from Citibank was used

---

**4.** According to plaintiff, Edelman actually borrowed the money, giving his personal guarantee, and then lent the money to the two partnerships. The evidence suggests that, although Edelman negotiated the loans and gave his guarantee, Citibank treated the loans as loans to the partnerships (Dep. of Tolli p. 36; Plaintiff's Exhibit 18).

**5.** None of the cases using this language required the disclosure of borrowings other than those for the purpose of acquiring the stock in question. *See Trane Co. v. O'Connor Securities, supra,* 561 F.Supp. at 309; *Standard Metals Corp. v. Tomlin, supra,* 503 F.Supp. at 604.

for the acquisition of MAI stock and not borrowed for the purpose of these other transactions.[6] The fact that the loans, in effect, remain outstanding does not establish with probable success that the proceeds were used to purchase MAI stock and, therefore, should have been disclosed. Section 13(d) does not require disclosure of all pre-existing indebtedness. *Standard Metals Corp. v. Tomlin, supra,* 503 F.Supp. at 604. Unlike the court in *Jewelcor v. Pearlman, supra,* 397 F.Supp. at 241, which found it likely that the acquirer was in a financial state that necessitated the use of outstanding borrowings to acquire the stock in question, this Court does not find, nor has it been presented with evidence indicating,[7] that the partnerships were in a financial position that necessitated the use of the outstanding Citibank borrowings for the purpose of acquiring MAI stock.

The Court is satisfied that on the present record plaintiff has failed to show probable success on the merits of this section 13(d) claim. Plaintiff, therefore, is not entitled to preliminary relief on these grounds.

*The Alleged Manipulation of Canal-Randolph Stock*

Plaintiff claims that defendants violated section 14(a) and rule 14a–9 by failing to disclose in their proxy statement that they fraudulently caused a rise in the price of Canal-Randolph stock through the issuance of false and deceptive press releases and that such deceptive conduct was a violation of section 10(b) and rule 10b–5. Section 14(a), however, does not require the disclosure of all unadjudicated bad acts that are not directly related to the election in question, *see GAF Corporation v. Heyman,* [current] (CCH) Fed.Sec.L.Rep. 99, 585 at 97, 307 (2d Cir.1983), unless criminal proceedings have been brought concerning them. *See* SEC Regulation S–K, 17 C.F.R. 229.401(f)(2) (1983). Omitted alleged bad acts must be material to the election before their disclosure is required by the proxy rules. An omission is only material "if there is a substantial likelihood that a reasonable investor would consider it important in deciding how to vote." *TSC v. Northway,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). Whether untested allegations in a civil complaint not involving the subject corporation would be important to a reasonable shareholder depends upon the relationship between the parties, the nature of the allegations made, the circumstances out of which they arose and the extent to which an action based on the allegations has been pursued. Whether that information would be considered important in deciding how to vote depends on the issues involved in the proxy contest itself. *GAF Corporation v. Heyman, supra,* [current] Fed.Sec.L.Rep. 99, 585 at 97, 307.

Plaintiff argues that the alleged manipulation of Canal-Randolph stock is material to the issues involved in the proxy contest because they affect the believability of defendants' claims that their past experience with Canal-Randolph fits them for similar responsibility with MAI. Defendants' proxy statement, however, makes no mention of defendants' record with Canal-Randolph. Plaintiff relies on what it contends is the perception of the market place and a statement made by Zimmerman of Salomon Brothers to Edelman to support its contention that the alleged manipulation is material to the proxy contest. Zimmerman told Edelman that the increase in the price of Canal-Randolph shares would be likely to influence some shareholders in defendants' favor in an MAI proxy contest because it

---

6. The parties are in dispute as to whether Edelman was even aware of MAI at the time the loans were made.

7. Plaintiff did introduce the Citibank Credit Memo which noted that the loans were needed to increase the trading ability and liquidity of the partnerships which had been impacted by the holding and purchase of considerable blocks of Canal-Randolph stock. This statement alone, however, does not indicate that the partnerships' financial condition was such that it was necessary to use loan proceeds for the purchase of MAI stock.

would show MAI shareholders that defendants had "delivered on their promise of higher values" of Canal-Randolph shares. (Dep. of Zimmerman p. 95).

■ The issue presented by plaintiff's claim is not whether the Canal-Randolph press releases were misleading or should have been corrected by subsequent releases. The issue presented is whether defendants' proxy statement should have disclosed that defendants manipulated the price of Canal-Randolph stock by issuing misleading press releases and failing to advise shareholders of material changes in circumstances with regard to matters as to which there had been a prior press release. Even assuming the validity and materiality of plaintiff's allegations, defendants were not required to state in their proxy materials that they had manipulated Canal-Randolph stock. An admission of guilt as to a disputed fact is not required by the proxy rules. *Amalgamated Clothing v. J.P. Stevens & Co.*, 475 F.Supp. 328, 331 (S.D.N.Y. 1979), *vacated as moot*, 638 F.2d 7 (2d Cir.1980) (per curiam); *see Avnet Inc. v. Scope Industries*, 499 F.Supp. 1121, 1125 (S.D.N.Y.1980), *aff'd by summary order*, 659 F.2d 1057 (2d Cir.1981). Disclosure of the allegations in pending litigation that are material to the issues involved in the proxy contest is all that is required. *Id.*

The relevance of the allegations concerning the misleading press releases to this action is dependent upon the allegation that the manipulation was willful, thus bearing upon the integrity of the nominees, and the allegation that the manipulation was part of a scheme to mislead MAI shareholders. Absent these allegations, the issuance of allegedly misleading press releases is not a material issue in this proxy contest, and need not have been disclosed in defendants' proxy materials. This is not a situation where litigation alleging violations of rule 10b–5 was pending at the time the proxy materials were filed. The allegations that plaintiff claims should have been disclosed were made by the plaintiff in the context of this proxy litigation. In the cases cited by the plaintiff, the allegations of securities violations that were required to be disclosed predated the proxy litigation. *See Zell v. Intercapital Income Securities, Inc.*, 675 F.2d 1041 (9th Cir.1982); *Bertoglio v. Texas International Co.*, 488 F.Supp. 630 (D.Del.1980); *Rafal v. Geneen*, [1972–1973 Transfer Binder] (CCH) Fed.Sec.L. Rep. 93, 505 (E.D.Pa.1972); *Robinson v. Penn Central Co.*, 336 F.Supp. 655 (E.D. Pa.1971); *Beatty v. Bright*, 318 F.Supp. 169 (S.D.Iowa 1970). To enjoin defendants from voting any shares of MAI stock pending disclosure of allegations made by their opposition in the proxy contest, the materiality of which are dependent upon those same allegations, would be to put a powerful tool in the hands of management. Plaintiff must establish probable success on the merits of its willful manipulation claim with respect to Canal-Randolph stock for the allegations based on that claim to be material to the proxy contest and a basis for preliminary injunctive relief.

The evidence demonstrates that Canal-Randolph issued a press release on August 26, 1983 announcing that it had received an offer to purchase all seven of its operating real estate properties. On September 23, an announcement was made that management was still pursuing the proposal. The offer was withdrawn, effective October 5. A press release was not issued announcing the withdrawal. On November 2, management announced that it had received a number of offers, that each was being analyzed and that the directors would soon meet to consider adoption of a plan of complete liquidation. On December 5, however, French advised the Canal-Randolph Board of Directors, but not the public, that there were no outstanding offers for the package of seven properties. (Plaintiff's Exhibit 9 p. 1). One month later plaintiff publicly reiterated that it was "continuing to evaluate offers for its real estate properties." Finally, on January 5, Canal-Randolph publicly announced that its board of directors had approved the submission to the shareholders of a proposed plan of liquidation. The Company had announced, on November 5, that a plan of liquidation would be

proposed if the board accepted an offer to purchase the seven real estate properties.

On May 6, 1983, Canal-Randolph issued a press release announcing that the board had authorized the formulation of a plan to spin-off United Stockyards Corporation, Canal-Randolph's largest subsidiary, and that, prior to any final action, a tax ruling would be sought. Six days later the company announced that the spin off was likely to occur before the end of the year, but made no mention of a tax ruling. Press releases issued on June 16 and August 30 referred to the spin-off. On September 15, the Company issued a release which included a statement that the board was still awaiting an advance tax ruling. Michael Friess, Canal-Randolph's tax counsel, had called French on September 13 to tell him that the Internal Revenue Service had technically closed Canal-Randolph's case, but that it would re-open and continue to process the request once Canal-Randolph provided certain additional information. (Exhibit D to Martin Affidavit). A September 23 announcement stated that the spin-off plan included a distribution to shareholders. A November press release stated essentially the same thing.

Plaintiff alleges that the press releases concerning the properties were false and misleading because they announced inchoate offers, did not announce the withdrawal of those offers, failed to disclose impediments to accepting offers for certain of the properties and created the impression that sale of the properties was imminent. The press releases regarding United Stockyards were misleading, according to plaintiff, because they failed to announce that a tax ruling was no longer being sought for the spin-off, thereby creating the impression that the distribution would be tax free. Plaintiff has also introduced evidence showing the impact that these press releases had on the market and suggesting that sophisticated market followers, such as the *New York Times* and *Value Line* were misled by the releases.

■ The Court is not satisfied, however, that the record shows probability of success on the merits of the claim that defendants wilfully manipulated the price of Canal-Randolph stock. Defendants explain that press releases were not issued when individual offers for the property fell through because they never deviated from their plan, announced in the initial press release, to try to sell all seven of the properties. They also claim that the impediments plaintiff refers to do not prevent the sale of the properties. They explain their announcement that a tax ruling was still being pursued on September 15, two days after the phone call from Friess, by stating that it was not until after this press release was issued that Canal-Randolph decided not to have its case reopened with the IRS. The decision to abandon the tax ruling was made after Canal-Randolph received an offer for all seven of its properties and the board decided to consider liquidating the company, a transaction which cannot involve a tax free distribution to shareholders. Defendants claim that they thought that their announcement that a plan of liquidation was being pursued was sufficient to inform shareholders that the spin-off would not result in a tax free distribution, as distributions in liquidation are not tax free transactions. Without ruling on the wisdom of these releases and noting that a less stringent standard of disclosure is applied to press releases than to proxy statements, *Zucker v. Sable*, 426 F.Supp. 658, 662 (S.D.N.Y.1976); *see Rosenblatt v. Northwest Airlines, Inc.*, 435 F.2d 1121, 1128 (2d Cir.1970), the Court finds that the press releases and the circumstances surrounding their issuance that are on the record do not demonstrate probable success on the merits plaintiff's claim that defendants willfully manipulated Canal-Randolph stock.

Furthermore, MAI's stockholders, although not apprised of the facts forming the basis for these claims, are aware that defendants have been charged by management with fraudulently manipulating the price of Canal-Randolph stock. Defendants included this charge and the charge that they had manipulated the price of MAI

stock in the summary of litigation pending against them in their proxy statement. Stockholders are, thus, informed that charges impugning the nominees integrity are outstanding.

*Investment Company Act Violations*

Plaintiff claims that defendants violated section 14(a) by failing to disclose in their proxy statement that Arbitrage and Plaza constitute a single investment company that is in violation of sections 7 and 8 of the Investment Company Act of 1940 ("ICA"). They argue that failure to disclose this status is a material omission from the proxy statement because the alleged undisclosed violation exposes Plaza, Arbitrage and Edelman to potential criminal liability and affects their ability to hold MAI stock. Under the ICA, investors have the right to rescind purchases of securities sold to them in violation of the ICA. Plaintiff argues that if investors in Plaza and Arbitrage rescinded their investments, partnership capital would be eroded which would affect the partnerships' ability to continue to hold MAI stock.

Section 7 of the ICA prohibits the offer, sale or purchase of any security by an investment company unless the company has registered with the SEC pursuant to section 8 of the ICA. Both Plaza and Arbitrage are primarily engaged in the business of investing and trading securities and almost all of their assets are securities. Thus they qualify as investment companies under sections 3(a)(1) and 3(a)(3) of the ICA. Section 3(c)(1), however, excepts issuers whose outstanding securities "are beneficially owned by not more than one hundred persons and which is not making and does not presently propose to make a public offering of its securities" from the requirements of the ICA. Neither Plaza, nor Arbitrage is beneficially owned by more than one hundred persons or has made or proposes to make a public offering of its securities.

Plaintiff argues, however, that the two partnerships are actually one under the "integration" doctrine. This doctrine allows the SEC to "look behind ostensibly separate ... issuers ... to see ... if they are really a single ... issuer." *PBT Covered Option Fund*, [1979–1980 Transfer Binder] (CCH) Fed.Sec.L.Rep. 82, 407 (SEC 1979).[8] The doctrine, thus, prevents essentially interchangeable investment vehicles from avoiding the ICA's jurisdiction by operating as separate entities. The SEC staff has stated that the determination of whether it is appropriate to treat two issuers as one for purposes of the ICA depends upon whether an interest in one issuer would be considered materially different than an interest in another by a reasonable investor qualified to purchase both. *See id.* Factors to be considered are whether the partnerships have the "same investment objectives, the same types of portfolio securities, and, particularly, similar portfolio risk/return characteristics." *Id.*

Although the second private offering memorandum of Plaza (Plaintiff's Exhibit 48A) and the testimony of Michael Navalenko, a general partner in Plaza and an employee of Arbitrage, (Dep. of Navalenko pp. 19–29) suggest that both partnerships have similar, although not identical, investment objectives and tend to purchase similar, although not identical, kinds of securities, the evidence shows that the partnerships have different risk/return characteristics and different emphases within the spheres in which the investments are made.

The Court finds that the percentage of return on investment that limited partners can receive under the two partnership agreements is substantially different. Limited partners in Arbitrage would be unlikely to receive more than a ten per cent return, if a series "A" partner, or a six per cent return, if a series "B" partner. (Plaintiff's Exhibit 56 pp. 11–12). The Plaza partnership agreement does not limit the

---

**8.** It should be noted that this is a SEC staff and not a statutory, regulatory or judicial position. It has been set forth in no action letters. Plaintiff did not direct the Court to any cases requiring application of this doctrine.

return limited partners may receive on their investment. (Plaintiff's Exhibit 55 pp. 8–10). In addition, the differences in the average actual rate of return to individual investors demonstrates that the partnerships have different risk/return characteristics. The average actual return to Arbitrage limited partners has been approximately ten per cent for series "A" partners and six per cent for series "B" partners (Exhibit B to Martin Affidavit p. 4). The average actual rate of return to Plaza limited partners, however, was over thirty per cent. (Exhibit B to Martin Affidavit p. 10). The Court finds that this actual rate of return is more significant to the reasonable investor than revenues as a percentage of average ownership equity that plaintiff's expert witness testified were substantially the same for both partnerships.

The evidence also shows that although the partnerships have similar investment policies and practices, they have different emphases. Arbitrage tries "to give a completely secure return to its partners, general and limited, without taking very much risk" (Dep. of Edelman p. 251), while Plaza was formed "to take more risk in order to earn more return." (Dep. of Navalenko p. 9). One of the goals of Arbitrage is to generate ordinary losses and long-term capital gain (Exhibit B to Martin Affidavit p. 2), thus appealing to investors interested in tax rollovers. Finally, Arbitrage invests heavily in both commodities futures and government securities. (Dep. of Navalenko pp. 26–27; Exhibit B to Martin Affidavit pp. 2, 5).

■ Because of the difference in risk/return characteristics, which is probably the primary concern of the reasonable investor, and the different emphases of the two partnerships, the Court finds that plaintiff has not established probable success on the merits of its claim that the two partnerships are essentially one pursuant to the integration doctrine. If the two partnerships are not treated as one, they have not violated the ICA by failing to register with the SEC before offering or selling their securities to investors, as they

each have less than 100 investors. Thus failure to report the violation in their proxy statement does not violate section 14(a).

Furthermore, the Court has serious doubts concerning the materiality of these alleged violations to the issues involved in the proxy contest. *See General Time Corporation v. Talley Industries, Inc.*, 403 F.2d 159, 163 (2d Cir.1968) (SEC's adjudication of violation of the ICA was not sufficiently material to demand a further submission to stockholders and an adjournment of the meeting), *cert. denied* 393 U.S. 1026, 89 S.Ct. 637, 21 L.Ed.2d 570 (1969); *Avnet, Inc. v. Scope Industries*, 499 F.Supp. 1121, 1127–28 (1980) (alleged status as an unregistered investment company in violation of the ICA not likely to be viewed by a reasonable shareholder as having significantly altered the total mix of information), *aff'd by summary order* 659 F.2d 1057 (1981). The Second Circuit stated in *GAF Corporation v. Heyman, supra,* [current] (CCH) 99,585 at 97,307, that "unadjudicated allegations in a pending civil action against a director nominee shall not automatically be deemed material." The Court then held that allegations of breach of trust against the nominee in an action unrelated to the issuer did not raise serious questions concerning the nominee's fitness to serve as a director. This Court finds that the alleged ICA violation is similarly unrelated to the material issues in this proxy contest.

Plaintiff has not established possibility of success on the merits of its claim that defendants violated section 14(a) by failing to disclose that they were in violation of the ICA in their proxy statement. Thus the Court denies plaintiff's request for a preliminary injunction on this ground.

*Section 5 Claim*

■ Plaintiff's final claim alleges that defendants violated section 14(a) by failing to disclose in their proxy statement that Plaza and Arbitrage unlawfully issued securities without registering them under section 5 of the Securities Act of 1933. The mere allegation of this violation of section 5 does not make its omission from

the proxy statement material, *see GAF Corporation v. Heyman, supra,* [current] (CCH) 99,585 at 97,307.

Plaintiff has demonstrated that the SEC has no record that Plaza or Arbitrage filed a registration statement under the Securities Act, a registration statement under the ICA, Form D, or Form 146 or Form 242, the filings required to take advantage of the private offering exemptions outlined in former rule 146 and former rule 242 (Plaintiff's Exhibit 51). It has ignored the fact, however, that section 4(2) outlines a broad exemption from registration for "transactions by an issuer not involving any public offering" when the offer is made to a limited number of people with knowledge of the issuer. Issuers can take advantage of this exemption without filing with the SEC and without satisfying the requirements of a particular rule or regulation. Plaintiff's proof, ignoring this exemption, does not establish probable success on the merits of its claim that defendants violated section 5 of the Securities Act. As with the alleged violation of the ICA, the Court doubts the materiality of this alleged violation to the issues involved in this proxy contest. The Court finds that these issues are essentially economic in nature. Plaintiff has not established that it is entitled to a preliminary injunction on this ground.

*Irreparable Injury*

Having concluded that plaintiff has not made a sufficient showing of probable success on the merits of its claims to warrant a preliminary injunction, the Court need not address the question of irreparable harm. The Court recognizes that plaintiff has cited a number of cases that found irreparable harm in the fact that shareholders would be voting on the basis of misleading information or that a change in

corporate management could be effected by unlawful means.[9] *See, e.g. Edelman v. Salomon,* 559 F.Supp. 1178 (D.Del.1983); *Hanna Mining Co. v. Norcen Energy Resources,* 574 F.Supp. 1172, [1982 Transfer Binder] Fed.Sec.L.Rep. 98, 878 (N.D.Ohio 1982); *Berkman v. Rust Craft Greeting Cards, Inc.,* 454 F.Supp. 787 (S.D.N.Y. 1978); *Cooke v. Teleprompter Corp.,* 334 F.Supp. 467 (S.D.N.Y.1971). The Court also notes, however, that Judge Weinfeld has said

> To allow an election to proceed in the face of allegations of improper solicitations and misleading proxy materials does not in and of itself work an irreparable injury on the party challenging the materials. The Court possesses the power, if necessary, to void the election, order resolicitation and otherwise "unscramble" this kind of transaction. (footnotes omitted).

*Plant Industries Inc. v. Bregman,* 490 F.Supp. 265, 271 (S.D.N.Y.1980); *accord, Jewelcor Inc. v. Pearlman, supra,* 397 F.Supp. at 252; *D–Z Investment Co. v. Holloway,* [1973–1974 Transfer Binder] (CCH) Fed.Sec.L.Rep. 94,588 at 96,061 (S.D.N.Y.1974); *Sherman v. Posner,* 266 F.Supp. 871, 873–74 (S.D.N.Y.1966); *see Condec Corporation v. Farley,* 573 F.Supp. 1382, 1386 (S.D.N.Y.1983). *See also Kennecott Copper Corp. v. Curtiss-Wright Corp., supra,* 584 F.2d 1195, 1200–01 (2d Cir.1978).

In accordance with the foregoing, plaintiff's motion for a preliminary injunction is denied.

SO ORDERED.

---

**9.** The Court also notes that plaintiff has alleged irreparable injury arising out of the vesting of employee rights in certain employee compensation plans upon a change of management. Election of Edelman's slate of directors would qualify as a change in management under these plans. (Affidavit of Scharges). Although plaintiff has estimated that the aggregate sum payable by MAI as a result of the vesting of these plans is $8,250,000, the Court does not find that

this is the type of irreparable injury that justifies enjoining defendants from voting any shares of MAI stock. It would be inequitable for this Court to allow management to use generous executive compensation plans that they adopted to fend off a challenge to their control. The claim that implementation of plans that management adopted would result in irreparable injury to shareholders, if anything, casts doubt on the integrity of management.